Nos. 22-6014 & 23-5439

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

―――――――――

AMERICAN RELIABLE INSURANCE COMPANY, *et al.*,
STATE FARM FIRE & CASUALTY COMPANY, *et al.*,
UNITED SERVICES AUTOMOBILE ASSOCIATION, *et al.*,
ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, *et al.*,
AUTO-OWNERS INSURANCE COMPANY, *et al.*,

Plaintiffs-Appellants / Cross-Appellees,

v.

UNITED STATES OF AMERICA,

Defendant-Appellee / Cross-Appellant.

―――――――――

On Consolidated Cross-Appeals from the United States
District Court for the Eastern District of Tennessee
(Nos. 3:19-cv-469, 3:19-cv-470, 3:19-cv-472, 3:19-cv-474, 3:19-cv-478)

―――――――――

## PRINCIPAL AND RESPONSE BRIEF
## FOR UNITED STATES OF AMERICA

―――――――――

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MARK B. STERN
JEFFREY E. SANDBERG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7214*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 532-4453*

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF JURISDICTION ................................................................ 1

STATEMENT OF THE ISSUES ................................................................ 4

STATEMENT OF THE CASE ................................................................ 5

    A.   Statutory Background ................................................................ 5

    B.   Factual Background ................................................................ 6

    C.   District Court Proceedings ................................................ 15

        1.   The Plaintiffs' Complaints ................................................ 15

        2.   The District Court's Decision .......................................... 17

        3.   Further Proceedings .......................................................... 23

SUMMARY OF ARGUMENT ................................................................ 25

STANDARD OF REVIEW ................................................................ 27

ARGUMENT ................................................................ 28

PLAINTIFFS' NEGLIGENCE CLAIMS FALL WITHIN THE
DISCRETIONARY FUNCTION EXCEPTION ........................................ 28

A.   THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS'
     FIRE-MANAGEMENT ALLEGATIONS ARE BARRED. ........................... 29

     1.   Challenged Conduct Is Discretionary Unless Employees Are
        Directed To Follow A Specific Course Of Action. ..................... 29

     2.   Plaintiffs Have Failed To Allege Any Relevant Violations Of
        Specific, Mandatory Firefighting Directives. ............................ 33

     3.   Plaintiffs' Fire-Management Allegations Challenge Conduct
        Susceptible To Policy Analysis. ................................................ 41

     4.   Plaintiffs' Other Contentions Are Without Merit. ...................... 44

B.      PLAINTIFFS' FAILURE-TO-WARN ALLEGATIONS ALSO FALL
        WITHIN THE DISCRETIONARY FUNCTION EXCEPTION. ........................ 46

        1.      No Specific, Mandatory Directive Dictated What, When, Or
                How To Warn The Public About The Fire. .............................. 47

        2.      The District Court Erred In Its Abbreviated Analysis Of The
                Failure-To-Warn Allegations. ................................................... 52

        3.      Decisions About What, When, And How To Warn The
                Public Are Susceptible To Policy Analysis. ............................... 56

CONCLUSION ......................................................................................... 59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

# TABLE OF AUTHORITIES

**Cases:**                                                      **Page(s)**

*A.O. Smith Corp. v. United States*,
  774 F.3d 359 (6th Cir. 2014) .............................. 5, 18, 31, 42, 50, 54, 56, 57

*Abbott v. United States*,
  518 F. Supp. 3d 1220 (E.D. Tenn. 2021) ................................................. 23

*Aragon v. United States*,
  146 F.3d 819 (10th Cir. 1998) ................................................. 49

*Bailey v. United States*,
  623 F.3d 855 (9th Cir. 2010) ....................................................... 52

*Berkovitz ex rel. Berkovitz v. United States*,
  486 U.S. 531 (1988) ............................................................ 5, 29, 41, 47, 53

*Blackburn v. United States*,
  100 F.3d 1426 (9th Cir. 1996) ................................................... 52

*Buckler v. United States*,
  919 F.3d 1038 (8th Cir. 2019) ................................................... 35

*Carlyle v. U.S. Dep't of the Army*,
  674 F.2d 554 (6th Cir. 1982)....................................................... 27, 44, 46

*Clendening v. United States*,
  19 F.4th 421 (4th Cir. 2021) ..................................................... 57

*Edwards v. Tennessee Valley Auth.*,
  255 F.3d 318 (6th Cir. 2001) ..................................................... 31

*EJS Props., LLC v. City of Toledo*,
  689 F.3d 535 (6th Cir. 2012) ..................................................... 2

*Elder v. United States*,
  312 F.3d 1172 (10th Cir. 2002) ................................................. 33

*Esquivel v. United States*,
  21 F.4th 565 (9th Cir. 2021) ..................................................... 32, 42, 43

*Fifth Third Early Access Cash Advance Litig., In re*,
  925 F.3d 265 (6th Cir. 2019) ........................................ 2

*Fisher Bros. Sales v. United States*,
  46 F.3d 279 (3d Cir. 1995) (en banc) ....................................... 38

*Foster Logging, Inc. v. United States*,
  973 F.3d 1152 (11th Cir. 2020) ........................................ 43, 44

*Gonzalez v. United States*,
  851 F.3d 538 (5th Cir. 2017) ................................... 33, 35-36, 47

*Gonzalez v. United States*,
  814 F.3d 1022 (9th Cir. 2016) ............................... 47

*Green v. United States*,
  630 F.3d 1245 (9th Cir. 2011)................................... 51

*Hardscrabble Ranch, LLC v. United States*,
  840 F.3d 1216 (10th Cir. 2016) ............................ 32, 33, 41, 43

*Hart v. United States*,
  630 F.3d 1085 (8th Cir. 2011) ................................ 36

*Hertz v. United States*,
  560 F.3d 616 (6th Cir. 2009) ................................... 27

*Jude v. Commissioner of Soc. Sec.*,
  908 F.3d 152 (6th Cir. 2018) ............................ 18, 28, 50, 54

*Katrina Canal Breaches Litig., In re*,
  696 F.3d 436 (5th Cir. 2012) ................................ 41

*Kohl v. United States*,
  699 F.3d 935 (6th Cir. 2012) ........................... 29, 42

*Lam v. United States*,
  979 F.3d 665 (9th Cir. 2020) ................................ 33

*Little v. Louisville Gas & Elec. Co.*,
  805 F.3d 695 (6th Cir. 2015) ................................ 3

*Lowery v. Federal Express Corp.*,
  426 F.3d 817 (6th Cir. 2005).................................. 2

*Miller v. United States*,
    163 F.3d 591 (9th Cir. 1998) ....................................... 32, 33, 42, 43, 45, 51

*Montez ex rel. Hearlson v. United States*,
    359 F.3d 392 (6th Cir. 2004) ............................................................. 31, 42

*Montijo-Reyes v. United States*,
    436 F.3d 19 (1st Cir. 2006) ..................................................................... 38

*Myers v. United States*,
    17 F.3d 890 (6th Cir. 1994) ......................................................... 44, 50, 54

*Ohlsen v. United States*,
    998 F.3d 1143 (10th Cir. 2021) .............................................................. 33

*Rayonier Inc. v. United States*,
    352 U.S. 315 (1957) ............................................................................... 44

*Reed v. United States*,
    426 F. Supp. 3d 498 (E.D. Tenn. 2019) ................................... 23, 53, 54, 55

*Rich v. United States*,
    119 F.3d 447 (6th Cir. 1997) ................................................................. 57

*Rosebush v. United States*,
    119 F.3d 438 (6th Cir. 1997) ...................... 26, 30, 31, 42, 47, 52, 53, 57, 58

*S.R.P. ex rel. Abunabba v. United States*,
    676 F.3d 329 (3d Cir. 2012) .................................................................. 52

*Schurg v. United States*,
    63 F.4th 826 (9th Cir. 2023) ....................................................... 50, 51, 57

*Scott v. First S. Nat'l Bank*,
    936 F.3d 509 (6th Cir. 2019) ................................................................. 16

*Seaside Farm, Inc. v. United States*,
    842 F.3d 853 (4th Cir. 2016) ................................................................. 49

*Sharp ex rel. Sharp v. United States*,
    401 F.3d 440 (6th Cir. 2005) ................................................. 27, 31, 56, 57

*U.S. Fid. & Guar. Co. v. United States*,
    837 F.2d 116 (3d Cir. 1988) .................................................................. 45

*United States v. Gaubert*,
  499 U.S. 315 (1991) ........................ 5, 17, 25, 26, 29, 41, 42, 47, 53, 55, 56

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*),
  467 U.S. 797 (1984) ................................................................28, 44, 45, 55

*Valdez v. United States*,
  56 F.3d 1177 (9th Cir. 1995) ...................................................... 33

*Vance v. United States*,
  No. 3:19-CV-283, 2019 WL 7041500 (E.D. Tenn. Dec. 20, 2019) ........... 23

**Statutes:**

Federal Tort Claims Act (FTCA):
  28 U.S.C. § 1346(b) ................................................................. 1, 5
  28 U.S.C. § 1346(b)(1) ............................................................ 5, 28
  28 U.S.C. §§ 2671-2680 ........................................................... 1, 5
  28 U.S.C. § 2674 ................................................................... 5, 28
  28 U.S.C. § 2675 ................................................................... 24
  28 U.S.C. § 2675(a) ................................................................ 15
  28 U.S.C. § 2680(a) ...................................... 4, 5, 16, 17, 28, 37, 45, 56, 58

28 U.S.C. § 1292(b) .........................................................................1, 2, 3

**Rule:**

Fed. R. Civ. P. 54(b) ................................................................. 1, 2

**Other Authorities:**

Mem. Op., *Reed v. United States*,
  No. 3:18-cv-201 (E.D. Tenn. Sept. 8, 2020), Dkt. No. 87 ........................ 56

Order, *In re American Reliable Ins. Co.*,
  No. 22-507 (6th Cir. May 11, 2023)........................................................ 2-3

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-appellants/cross-appellees have requested oral argument.

The government agrees that oral argument would likely be of assistance to the

Court given the unusual posture of these cross-appeals and in light of the

factual and legal commonalities among plaintiffs' various theories for relief.

## STATEMENT OF JURISDICTION

These cross-appeals arise from five parallel suits in the Eastern District of Tennessee under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680.  *See, e.g.*, Am. Compl. ¶¶ 9, 14, RE32, PageID#1928.[1]  The government moved to dismiss each suit for lack of subject-matter jurisdiction. In a November 2020 order, the district court granted the government's motions to dismiss as to plaintiffs' fire-management allegations but denied the motions as to plaintiffs' failure-to-warn allegations.  *See* Mem. Op. & Order (Op.), RE51, PageID#3938-65.  As to the dismissed fire-management allegations, the court entered a partial final judgment under Federal Rule of Civil Procedure 54(b) and, in the alternative, certified an interlocutory appeal under 28 U.S.C. § 1292(b).  *See* Mem. Op. & Order 8-15, RE145, PageID#4872-79.  As to the non-dismissed failure-to-warn allegations, the court certified interlocutory appeal under § 1292(b).  *Id.* at 15-19, PageID#4879-83.

***Plaintiffs' Appeals*.**  Plaintiffs collectively commenced two proceedings in this Court.  First, plaintiffs filed a notice of appeal of the district court's Rule 54(b) judgment, which was docketed in this Court as Case No. 22-6014. Second, plaintiffs filed a petition for permission to appeal under § 1292(b),

---

[1] As in plaintiffs' brief, all RE citations are to *Auto-Owners Insurance Co. v. United States*, No. 3:19-cv-478 (E.D. Tenn.), unless otherwise indicated.

which was docketed in this Court as Case No. 22-507.  On May 11, 2023, this

Court denied plaintiffs' § 1292(b) petition on the grounds that it was

"redundant" and "unnecessary."  Under this Court's precedent, however,

plaintiffs' § 1292(b) petition provides the procedurally proper path for

interlocutory appellate review of the dismissed allegations, and this Court

should exercise jurisdiction over plaintiffs' appeal under 28 U.S.C. § 1292(b).[2]

---

[2] The district court properly certified plaintiffs' fire-management allegations for interlocutory appeal under 28 U.S.C. § 1292(b) but erred in entering partial final judgment under Federal Rule of Civil Procedure 54(b). This Court independently reviews Rule 54(b) certifications and dismisses the appeal if the certification was improper.  *See, e.g.*, *EJS Props., LLC v. City of Toledo*, 689 F.3d 535 (6th Cir. 2012).  Partial final judgment is proper only "[w]hen an action presents more than one claim for relief" and the district court permissibly "determines that there is no just reason for delay."  Fed. R. Civ. P. 54(b).  "A 'claim' under Rule 54(b) 'denotes the aggregate of operative facts which give rise to a right enforceable in the courts' even if the party has raised different theories of relief."  *EJS Props.*, 689 F.3d at 538.  This Court "examine[s] the causes of action as pleaded in the complaint and consider[s] whether they 'seek to recover for the same underlying injury.'"  *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 273 (6th Cir. 2019) (quoting *Lowery v. Federal Express Corp.*, 426 F.3d 817, 821 (6th Cir. 2005)).  Here, as in *Lowery*, Rule 54(b) cannot be used because the dismissed and non-dismissed allegations arise from the same "aggregate of operative facts," raise substantially similar legal and factual issues, and seek to recover for the same underlying injury.  *Cf., e.g.*, *State Farm* Compl. ¶ 89, RE1, PageID#16-17 (pleading a single cause of action encompassing alternative allegations).

This Court may, however, exercise jurisdiction under § 1292(b).  The Court previously denied plaintiffs' § 1292(b) cross-petition as "redundant," reasoning that "[b]ecause Subrogation Plaintiffs and the United States both petition for review of *the same order*, granting the United States' petition allows us to review the district court's dismissal of Subrogation Plaintiffs' fire-management claims."  Order at 5, *In re American Reliable Ins. Co.*, No. 22-507

*Continued on next page.*

***United States' Cross-Appeal.***  On November 17, 2022, the United States

filed a timely petition for permission to appeal pursuant to 28 U.S.C. § 1292(b).

The Court granted the petition on May 11, 2023; docketed the appeal as Case

No. 23-5439; and consolidated the case with plaintiffs' appeal.  Jurisdiction

over the United States' cross-appeal rests on 28 U.S.C. § 1292(b).

---

(6th Cir. May 11, 2023) (emphasis added).  But this Court has held that when a
district court's opinion embodies a series of distinct rulings—some favorable to
plaintiff, others to defendant—both parties must petition for appeal if they
desire interlocutory review.  That is because "[t]he word 'order,' in the context
of § 1292(b), refers to a specific direction or command from the district court,
not to the document or opinion in which the court explains that direction or
command." *Little v. Louisville Gas & Elec. Co.*, 805 F.3d 695, 699 (6th Cir.
2015).  Thus, in *Little*, where the defendants petitioned for interlocutory appeal
as to certain non-dismissed claims but the plaintiffs "never filed a cross-
petition" as to certain dismissed claims, "§ 1292(b) d[id] not empower this
court to consider" the plaintiffs' claims of error "on interlocutory appeal." *Id.*
    The United States respectfully suggests that this Court either revise its
May 11, 2023 Order so as to grant review in Case No. 22-507 or, alternatively,
to construe that Order as having authorized both petitions in light of the
Court's manifest intention to reach and resolve plaintiffs' appeal.

## STATEMENT OF THE ISSUES

Plaintiffs, insurance companies subrogated to claims by their policyholders, seek damages under the Federal Tort Claims Act for property losses sustained from a wildfire that began within a national park and later spread unexpectedly to surrounding areas.  Plaintiffs assert that the federal government was negligent in two principal respects.  First, they urge that the government was negligent in failing to suppress the fire (the fire-management allegations).  Second, they claim that the government negligently failed to warn surrounding communities and property owners of the fire's potential spread (the failure-to-warn allegations).  The government moved to dismiss all allegations as facially barred by the FTCA's discretionary function exception, 28 U.S.C. § 2680(a).  The questions presented are:

1. On plaintiffs' appeal, whether the district court erred in concluding that plaintiffs' fire-management allegations fall within the discretionary function exception.

2. On the United States' cross-appeal, whether the district court erred in ruling that plaintiffs' failure-to-warn allegations are not barred by the discretionary function exception.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, provides a limited waiver of sovereign immunity and creates a cause of action for certain tort claims against the federal government "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* § 1346(b)(1); *see id.* § 2674.

Several provisions limit the scope of the FTCA's waiver of sovereign immunity.  As relevant here, the discretionary function exception bars suit for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  This exception applies whenever the conduct challenged by plaintiffs both "'involve[s] an element of judgment or choice'" and is "'susceptible to policy analysis.'"  *A.O. Smith Corp. v. United States*, 774 F.3d 359, 364-65 (6th Cir. 2014) (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988), and *United States v. Gaubert*, 499 U.S. 315, 325 (1991)).

**B.    Factual Background[3]**

These appeals concern losses caused by an unprecedented wildfire, the Chimney Tops 2 Fire, which originated in Great Smoky Mountains National Park during an extended drought late in the 2016 fire season.  National Park Service (NPS), *Chimney Tops 2 Fire Review: Individual Fire Review Report* 63 (2017) (*NPS Review Report*), RE32-9, PageID#3460; Am. Compl. ¶ 53, RE32, PageID#1937.[4]

In the twilight hours of Wednesday, November 23, 2016—the evening before Thanksgiving Day—the Park's Fire Management Officer, Greg Salansky, spotted smoke from a small vegetation fire that was smoldering on the north spire of Chimney Tops, a steep 4,800-foot peak within the Park's interior.  Am. Compl. ¶¶ 16, 58, RE32, PageID#1929, 1938.  Upon scrambling along cliffs to the site, Officer Salansky determined that an immediate direct attack on the fire would be both difficult and dangerous given its location among dense vegetation on hazardous terrain.  *Id.* ¶ 59, PageID#1939; *NPS Review Report* 9, 45, RE32-9, PageID#3406, 3442.

---

[3] All factual statements are taken directly from the allegations in plaintiffs' various complaints and their attached exhibits.

[4] It was given this name because another recent, nearby fire was the "Chimney Tops 1 Fire," which had been reported on November 13, 2016 and successfully contained.  *See NPS Review Report* 38, RE32-9, PageID#3435.

Officer Salansky, a qualified Type 3 Incident Commander, accepted immediate responsibility for overseeing the Park's response to the fire. *NPS Review Report* 9, 36, RE32-9, PageID#3406, 3433 (noting that "[d]ue to the Thanksgiving holiday, most of the fire staff was on leave"); Am. Compl. ¶¶ 61-62, RE32, PageID#1939. The Park Service immediately issued a press release describing the fire as "approximately 1.5 acres with slow rates of spread, smoldering in a location approximately ¼ mile from the Chimney Top 1 Fire, and located in extremely remote, steep and inaccessible terrain." *NPS Review Report* 38, RE32-9, PageID#3435; *see* Am. Compl. ¶ 245, RE32, PageID#1976.

The next morning (Thanksgiving), Officer Salansky and another firefighter hiked back to Chimney Tops through difficult terrain. Officer Salansky observed that the fire had not grown much, that winds were calm, and that the area had received trace rainfall overnight. Am. Compl. ¶ 65, RE32, PageID#1940; *NPS Review Report* 9-10, RE32-9, PageID#3406-07. After considering the fire's near-vertical location and small size, Officer Salansky again concluded that "building direct fire lines in the boulders, cliffs and duff would be impossible," and he "began to assess options to contain the fire" using "natural and human-made barriers." Am. Compl. ¶ 66, RE32, PageID#1940; *see NPS Review Report* 10, RE32-9, PageID#3407. With approval from the Park's Deputy Superintendent, Officer Salansky and the fire-

management team delineated a 410-acre "containment box" in which to hold the fire using existing topographic and natural barriers, roads, and trails. Am. Compl. ¶¶ 68-70, RE32, PageID#1940-41. Officer Salansky believed, based on "historical fire behavior" in the Park and in light of forecasted rain, that the "fire would never reach the perimeters of the box." *Id.* ¶ 68, PageID#1940 (quoting *NPS Review Report* 10, RE32-9, PageID#3407). "Crews had been responding steadily to fires since July and had been successful with similar strategies and tactics." *NPS Review Report* 51, RE32-9, PageID#3448.

The next day (Friday), the fire again remained small and, as before, inaccessible. Am. Compl. ¶¶ 77-78, RE32, PageID#1942. Officer Salansky and five firefighters spent the day scouting the perimeter for specific containment locations. *Id.* ¶ 77; *NPS Review Report* 11, RE32-9, PageID#3408. The Park Service issued another press release describing the fire as approximately 3 acres and slow-moving and informing the public of intended fire-suppression efforts. *NPS Review Report* 39, RE32-9, PageID#3436; Am. Compl. ¶¶ 246-247, RE32, PageID#1976. Officer Salansky conducted a "complexity analysis," yielding a determination that the fire was "small with low potential to make a significant run … with lower fire intensity and behavior." Am. Compl. ¶ 78, RE32, PageID#1942.

On Saturday, Officer Salansky and another firefighter again hiked to Chimney Tops and saw that the fire remained on inaccessible terrain and was relatively small—"6 to 8 acres in size"—"with no real change in fire behavior." Am. Compl. ¶ 86, RE32, PageID#1944; *see NPS Review Report* 13, RE32-9, PageID#3410.  Six other firefighters scouted for potential or existing fire lines. Am. Compl. ¶¶ 85, 87, RE32, PageID#1944.

At this point, weather reports predicted stronger winds and rain in the area starting Sunday and continuing into Monday.  Am. Compl. ¶ 80, RE32, PageID#1943.  The Park Service performed two technical "Near Term Fire Behavior" projections, one of which anticipated that the fire could potentially spread beyond the containment box.  *Id.* ¶ 88, PageID#1944.  Officer Salansky continued to believe, however, "based on historical fire events and practices in the park," that the planned strategy would successfully "catch and hold the fire."  *NPS Review Report* 13, RE32-9, PageID#3410.

Early the next morning (Sunday), Officer Salansky determined that the fire "'had become more active overnight'" and now required a "'more proactive'" response.  Am. Compl. ¶ 97, RE32, PageID#1947 (quoting *NPS Review Report* 14, RE32-9, PageID#3411).  He began ordering ground and aerial firefighting assets from various agencies, while firefighters continued to scout trails for indirect construction and containment lines.  *Id.* ¶¶ 100-101,

PageID#1947.  Among other assets, one Type 1 helicopter and two helitankers took turns dropping thousands of gallons of water onto the fire.  *Id.* ¶¶ 100, 103, PageID#1947-48; *NPS Review Report* 14-15, RE32-9, PageID#3411-12.[5] The Park Service assigned a public information officer to advise Park visitors about the fire and the Park Service's response.  Am. Compl. ¶ 248, RE32, PageID#1976; *NPS Review Report* 39, RE32-9, PageID#3436.  By evening, "the fire appeared quiet," with "no continuous line of fire visible."  *NPS Review Report* 16, RE32-9, PageID#3413.

On Monday, however, the weather changed dramatically.  Am. Compl. ¶ 113, RE32, PageID#1949.  An unusual formation called a "mountain wave" began carrying extreme winds over Chimney Tops, "careen[ing] down the mountain slopes like an invisible avalanche."  *Id.* ¶ 81, PageID#1943; *NPS Review Report* 63, 100, RE32-9, PageID#3460, 3497.  When firefighters returned at sunrise, they discovered that the fire had increased in intensity and grown to some 250-500 acres, with scattered "spot fires" caused by burning embers that evaded manmade or natural barriers.  Am. Compl. ¶¶ 114-117, RE32, PageID#1950.  Officer Salansky immediately began ordering more

---

[5] Park officials also considered use of aerially deployed flame retardant chemicals, but rejected that option because of its high cost and concerns that the retardant would pollute the "water supply for Gatlinburg and/or Pigeon Forge."  *NPS Review Report* 15, RE32-9, PageID#3412.

firefighting crews, air resources, and a complex fire incident management team. *NPS Review Report* 18, RE32-9, PageID#3415.

At approximately 10:00 am on Monday morning, the Park Service issued a press release stating that the fire had grown to approximately 500 acres; that certain "spot fires" had been detected within the Park at Bullhead Ridge and the Chimneys Picnic Area (areas somewhat closer to Gatlinburg); and that the Park Service was undertaking suppression efforts at those locations and had ordered additional firefighting resources. Am. Compl. ¶ 250, RE32, PageID#1976-77; *NPS Review Report* 39, RE32-9, PageID#3436. In the following several hours, the Park Service also issued "two additional press releases and conducted one press interview at park headquarters, providing updates to fire progressions, air quality advisories, and the areas affected by the fire." *NPS Review Report* 39, RE32-9, PageID#3436.

Park Service employees also began communicating directly with local public-safety officials, some of whom had already been alerted to eyewitness concerns about smoke and falling ash. Am. Compl. ¶¶ 119-121, RE32, PageID#1951. Just before 11:00 am, Officer Salansky spoke with a Gatlinburg Fire Department (GFD) captain. *Id.* ¶ 121. Officer Salansky warned that smoke from the Chimney Tops 2 Fire had the potential to travel to the city but that "the spread of fire to Gatlinburg [was] unlikely," especially given the

forecast for rain.  *Id.* ¶¶ 121, 256, PageID#1951, 1978.  Nevertheless, in light of the uncertainties, Officer Salansky requested and obtained assistance from GFD personnel and from other agencies with wildland fire units to help defend structures in the Park.  *Id.* ¶¶ 125-126, PageID#1952; *NPS Review Report* 18-19, RE32-9, PageID#3415-16.

Despite greatly increased firefighting efforts on the ground, weather conditions prevented any aerial attack on Monday, and the fire continued spreading with unexpected speed.  Am. Compl. ¶ 130, RE32, PageID#1953; *NPS Review Report* 19, RE32-9, PageID#3416.  The Park Service and local officials responded with urgent efforts to inform the public of the fire's risks. Around midday, Officer Salansky met with the Gatlinburg city manager, the GFD Chief, the Pigeon Forge Fire Chief, numerous Park leaders, and others to discuss the potential threat to Park neighbors.  *NPS Review Report* 20-21, RE32-9, PageID#3417-18.  At Officer Salansky's recommendation, the GFD began delivering voluntary evacuation notices in Mynatt Park, a Gatlinburg neighborhood abutting the Park.  *Id.*; Am. Compl. ¶ 127, RE32, PageID#1952. Officer Salansky and a GFD captain ensured that "all NPS and Gatlinburg Fire Department assets could have cross-communications with each other for command purposes."  *NPS Review Report* 21, RE32-9, PageID#3418.

12

Despite the coordinated efforts of federal and local firefighters, the fire continued spreading closer to the Park's boundary. *See NPS Review Report* 20, RE32-9, PageID#3417 (noting that fire was "bounc[ing] from ridge top to ridge top" and somehow "jump[ing]" over roads, trails, wet drainages, and wide creeks). By 5:00 pm, the Chimney Tops 2 Fire had pushed west along Newfound Gap Road, leading to an evacuation of Park headquarters. *Id.* at 23, PageID#3420. Local computer models nonetheless estimated that the fire would not reach Gatlinburg city limits for at least 19 hours, and at 5:00 pm, the GFD's Chief assured the public that "there is no fire in the city limits of Gatlinburg." *ABS Group Report* 22, 48, RE32-10, PageID#3535, 3561.

In the meantime, however, other wildfires outside the Park had also begun spreading rapidly. Officer Salansky received reports that "there were now structures in Gatlinburg that were burning from multiple ignition sources apart from the [Chimney Tops 2] fire." *NPS Review Report* 23, RE32-9, PageID#3420. By 6:00 pm, as a result of further deterioration of wind conditions and the absence of forecasted rain, the Chimney Tops 2 Fire breached the Park boundary and merged with other wildland fires in Sevier County. *Id.* at 3, 67, PageID#3400, 3464; Am. Compl. ¶¶ 134-138, RE32, PageID#1954-55.

13

Thereafter, fires multiplied throughout Gatlinburg and surrounding communities and caused catastrophic damage. Mandatory evacuation efforts were hampered by power outages and other infrastructure failures that frustrated officials' efforts to reach residents through phone warnings or other alerts. Am. Compl. ¶¶ 138-140, RE32, PageID#1955.

After the fires were finally extinguished, the Park Service commissioned an inter-agency expert review to "understand the decisions that were made" in determining how to respond to the Chimney Tops 2 Fire and "identify and share lessons learned" for purposes of improving future policies. *NPS Review Report* 5, RE32-9, PageID#3402. The experts found that Park officials had taken "the correct approach" by responding with an "indirect attack" and that the fire had behaved "as anticipated and as expected" for days following its discovery. *Id.* at 48, PageID#3445; *see also id.* at 46-47, PageID#3443-44. Then, on Monday, November 28, the fire began spreading at dramatic speed due to an "unprecedented" combination of factors "never … witnessed by anyone at the park," including "severe drought" and "extreme wind." *Id.* at 63, PageID#3460; *see also id.* at 2, PageID#3399.

The expert review concluded that there was "no evidence" of "negligence by anyone at the park." *NPS Review Report* 63, RE32-9, PageID#3460. Their report did find "several wildland fire situational

14

preparedness and planning weaknesses" warranting future policy

improvements. *Id.* But the experts cautioned that, in numerous respects, their

"findings and recommendations" pertained to technical or bureaucratic

matters that "would likely have *not* led to a different outcome on the Chimney

Tops 2 Fire." *Id.* at 57, PageID#3454 (emphasis in original); *see, e.g.*, *id.* at 59,

PageID#3456 (identifying, as one such consideration, Officer Salansky's

simultaneous authority over fire management officer, incident commander,

and duty officer functions).

### C.    District Court Proceedings

#### 1.    The Plaintiffs' Complaints

**a.** Plaintiffs in these five appeals are insurance companies subrogated to

property claims filed against them by their policyholders. All insurers brought

suit under the Federal Tort Claims Act after the Interior Department did not

finally resolve their administrative claims within six months. Am. Compl.

¶¶ 12-13, RE32, PageID#1928; *see* 28 U.S.C. § 2675(a). Plaintiffs in *American*

*Reliable*, *State Farm*, *United Services*, and *Allstate* filed suit in November 2019,

while plaintiffs in *Auto-Owners* filed suit in March 2020.

In their various complaints, plaintiffs assert substantially the same

theories of negligence, relating both to the Park Service's substantive

firefighting decisions (the fire-management allegations) and its public

communications concerning the fire (the failure-to-warn allegations).[6]  In their

fire-management allegations, plaintiffs assert that the Park Service negligently

failed to monitor the fire, to adhere to "mandatory command structure

requirements," and/or to utilize the "mandatory Wildland Fire Decision

Support System." *E.g.*, *American Reliable* Compl. ¶ 89(b), (e)-(f), RE1,

PageID#14-15; *accord Auto-Owners* Am. Compl. ¶¶ 150-182, 221-230, RE32,

PageID#1957-63, 1971-74.  In their failure-to-warn allegations, plaintiffs allege

that the Park Service did not "notify park neighbors of fire management

activities that have the potential to impact them" or warn local residents and

officials "about the status of and imminent danger presented by the Chimney

Top[s] 2 Fire." *E.g.*, *American Reliable* Compl. ¶ 89(c)-(d), RE1, PageID#14-15;

*accord Auto-Owners* Am. Compl. ¶¶ 239-269, RE32, PageID#1975-80.

    **b.**  The government moved to dismiss each case under the FTCA's

discretionary function exception, 28 U.S.C. § 2680(a), which precludes suit as

---

[6] Four of the complaints were filed by the same counsel and are virtually identical (including in asserting a single cause of action for "negligent fire spread"), while the *Auto-Owners* complaint was filed by other counsel and frames its claims in different terms.  To the extent the *Auto-Owners* plaintiffs sought to assert any different or additional claims, however, those claims were either "waived or abandoned" in district court, Op. 27, RE51, PageID# 3964, or their dismissal has not been contested in plaintiffs' opening brief, *cf. id.* at 26-27 (addressing the "use of complexity analysis" allegation, which is not renewed on appeal).  Any contrary argument has now been forfeited, *see, e.g.*, *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019), so this Court may treat all five cases as making the same allegations.

16

to "[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a **federal agency** or an **employee of the Government**, whether or not the discretion involved be abused." *Id.* That exception shields government decisionmaking from suit in tort so long as there was not "a federal statute, regulation, or policy" that "specifically prescribe[d] a course of action for an employee to follow" and the "judgment is of the kind that the discretionary function exception was designed to shield," *i.e.*, is "susceptible to policy analysis." *Gaubert*, 499 U.S. at 322-23, 325. The government explained that all of the conduct challenged by plaintiffs—including the Park Service's decisions about how to fight the Chimney Tops 2 Fire as well as its decisions about warning the public—implicated exercises of policy discretion by Park Service personnel, and none of the policy manuals and guidelines cited by plaintiffs had specifically divested responsible officials of relevant judgment and choice in making those decisions.

### 2.    The District Court's Decision

In a November 2020 ruling, the district court (Greer, J.) granted the government's motion to dismiss as to the fire-management allegations but denied it as to the failure-to-warn allegations. Op., RE51, PageID#3938-65.

17

The district court recognized that the discretionary function exception applies to conduct that both "involve[s] an element of judgment or choice" and is "susceptible to policy analysis."  Op. 6, RE51, PageID#3943 (quoting *A.O. Smith Corp.*, 774 F.3d at 364-65).  It explained that, at the first step, challenged conduct qualifies as discretionary unless "a federal statute, regulation, or policy specifically prescrib[es] a course of action" that "leav[es] the employee no [other] rightful option[s]."  *Id.* (quoting *A.O. Smith Corp.*, 774 F.3d at 364); *see id.* at 11, PageID#3948 (inquiring whether employee must "perform a particular action in a specific manner").  At the second step, conduct remains protected so long as it is "theoretically susceptible" to policy analysis.  *Id.* at 17, PageID#3954 (quoting *Jude v. Commissioner of Soc. Sec.*, 908 F.3d 152, 159 (6th Cir. 2018)).

*Fire-Management Allegations*.  The district court concluded that plaintiffs' various fire-management allegations—involving "fire monitoring," "command structure and step-up plan," and "use of [the] Wildland Fire Decision Support System"— fell within the discretionary function exception.  Op. 11-18, 23-26, RE51, PageID#3948-55, 3960-63 (capitalization omitted).  The court rejected plaintiffs' assertions that scattered statements in various agency policy and guidance documents had divested Park leadership of meaningful discretion when responding to the fire.  These documents included:

18

- NPS, *Great Smoky Mountains National Park: Fire Management Plan* (2010) (Park Plan), *see* RE32-6, PageID#2560-2646;

- NPS, *Director's Order #18: Wildland Fire Management* (2008) (DO-18), *see* RE32-4, PageID#2177-87;

- NPS, *Reference Manual 18: Wildland Fire Management* (2014) (RM-18), *see* RE32-5, PageID#2188-2559;

- *Interagency Standards for Fire and Fire Aviation Operations* (2016) (Redbook), *see* RE32-7, PageID#2647-3109; and

- NPS, *Fire Monitoring Handbook* (2003) (Handbook), *see* RE32-8, PageID#3110-3395.

*Fire monitoring*. The district court concluded that general statements cited by plaintiffs in the Fire Monitoring Handbook, Park Plan, RM-18, and DO-18 were "not specific enough to remove all discretion" in determining how to monitor forest fires. Op. 13, 16-17, RE51, PageID#3950, 3953-54. The Handbook "explicitly allow[ed] the NPS to use its discretion to pick an appropriate method that may not be listed," *id.* at 15, PageID#3952; relevant sections of the Park Plan likewise "provide[d] an element of judgment or choice to Park employees when deciding to monitor a fire," *id.*; RM-18 "provide[d] information to assist employees" but "d[id] not require" "any specific conduct," *id.* at 16, PageID#3953; and DO-18 likewise "d[id] not require mandatory conduct and instead g[ave] guidelines and options," *id.* at 17, PageID#3954.

19

At the second step of analysis, the district court explained that the government's fire-monitoring decisions permissibly involved "consideration [of] policy issues that the discretionary function exception was designed to protect, such as cost-benefit analysis, budget considerations, use of resources, and safety."  Op. 18, RE 51, PageID#3955.

*Command structure*.  The district court likewise rejected plaintiffs' arguments that cited policy documents divested officials of all relevant discretion with respect to staffing the command of the Park's fire response. Although Park Service policies contemplate that certain fire-management functions (including those of "incident commander" and "duty officer") should be assumed by different persons, the Park Plan specifically "gives Park employees discretion … [to] decide [what] is 'the safest, most effective, and most efficient means available while meeting identified fire management unit goals and objectives."  Op. 23-24, RE51, PageID#3960-61 (quoting Park Plan 30, RE32-6, PageID#2590).  The Redbook similarly "says it does not give 'absolute rules'" but "'require[s] judgment in application,'" *id.* at 24, and DO-18 "provides 'basic principles and strategic guidelines'" but affirms that "'[t]he circumstances under which a fire occurs, and the likely consequences on firefighter and public safety and welfare … dictate the appropriate response to the fire,'" *id.* (alteration in original).

20

At the second step of analysis, the district court concluded that the Park's staffing decisions in responding to the Chimney Tops 2 Fire over the Thanksgiving holiday (including when and how to evolve that structure in light of developments) could permissibly "take into consideration policy issues that the discretionary function exception was designed to protect." Op. 25, RE51, PageID#3962.

*Wildland Fire Decision Support System* (*WFDSS*). The district court rejected plaintiffs' reliance on statements in the Park Plan and RM-18 contemplating that Park Service personnel should utilize a specific web-based decision support process (the WFDSS) to document and guide their fire-management decisions. Op. 25-26, RE51, PageID#3962-63. "As already discussed, the RM-18 is discretionary by its own terms[.]" *Id.* at 26. And "when the objective is to manage a fire, the [Park Plan] gives broad discretion to the NPS and its employees to determine the most efficient, safe, and best tactics to address the fire, which would include using a decision support system." *Id.* The court thus dismissed all of the fire-management allegations.

***Failure-to-Warn Allegations.*** The district court ruled, however, that plaintiffs' failure-to-warn allegations could proceed. Op. 18-23, RE51, PageID#3955-60. The court summarily stated that while it "agreed that the [Park Plan] gave NPS employees discretion when monitoring fires, the same

21

cannot be said for notifying others about fires." *Id.* at 18, PageID#3955. The court believed that two provisions of the Park Plan divested personnel of all relevant discretion with respect to when and how to warn the public.

The first, Plan Section 3.3.2(C), lists several bullet-pointed "Management Considerations," beginning with "Firefighter and public safety is the first priority in all fire management activities" and "Minimum Impact Suppression Tactics will be employed." Park Plan 28, RE32-6, PageID#2588. The particular "Management Consideration[]" cited by the district court states: "Park neighbors, Park visitors and local residents will be notified of all planned and unplanned fire management activities that have the potential to impact them." *Id.*

The second, Park Plan Section 4.4.2(F), Table 13, contained within the Plan's "Wildland Fire Operational Guidance" (Section 4), is a table entitled "Mitigations for Public Safety Issues" that lists various areas of safety concern, including "Transportation Corridors," "Urban Interface and Park Infrastructure," and "Visitor Use." Park Plan 29, 55, RE32-6, PageID#2589, 2615. For each area, the table then sets out a bullet-pointed list of measures to mitigate safety concerns. *Id.* at 55, PageID#2615. With respect to the area of "Park Neighbors," the table identifies as mitigation measures "Inform park neighbors of wildland fires"; "Post current fire information on websites as

22

available"; and "Use information officer and/or park public affairs to disseminate information." *Id.*

The court acknowledged that failure-to-warn claims are typically precluded under this Court's discretionary-function precedents. *See* Op. 22, RE51, PageID#3959. It concluded, however, that plaintiffs' claims could proceed because "Section 3.3.2 and Table 13 of 4.4.2 are not written in a general manner." *Id.* at 23, PageID#3960.

### 3.    Further Proceedings

Following the district court's November 2020 ruling, these five cases were consolidated for trial with another set of cases arising from the Chimney Tops 2 Fire brought by six groups of individuals and property owners (the individual cases). The plaintiffs in the six individual cases originally asserted fire-management allegations substantially similar to those at issue here, as well as failure-to-warn claims. After the government moved to dismiss under the discretionary function exception, however, the plaintiffs in the individual cases voluntarily and expressly abandoned their fire-management allegations, choosing instead to proceed solely on a failure-to-warn theory.[7] The individual

---

[7] *See Reed v. United States*, 426 F. Supp. 3d 498, 503-04 (E.D. Tenn. 2019) (addressing abandonment of fire-management allegations); *Vance v. United States*, No. 3:19-CV-283, 2019 WL 7041500, at *2-3 (E.D. Tenn. Dec. 20, 2019) (same); *Abbott v. United States*, 518 F. Supp. 3d 1220, 1222-23 & n.1 (E.D. Tenn. 2021) (same).

plaintiffs' failure-to-warn claims were later dismissed for lack of administrative

presentment under 28 U.S.C. § 2675, and the plaintiffs in the individual cases

then appealed that dismissal.  *See Abbott v. United States*, Nos. 22-5492, -5493,

-5494, -5495, -5499 & -5513 (6th Cir.) (oral argument held Jan. 25, 2023).

Following the district court's dismissal of the individual cases, the

plaintiff insurers in these five cases announced their intent to seek interlocutory

review of the district court's November 2020 ruling.  The parties then sought

and obtained approval from the district court to pursue interlocutory appeals of

its rulings both as to the (dismissed) fire-management and (non-dismissed)

failure-to-warn allegations, which this Court in turn authorized on May 11,

2023.  *See supra* pp. 1-3 & n.2.

## SUMMARY OF ARGUMENT

The Chimney Tops 2 Fire, which began as a small, smoldering vegetation fire deep within Great Smoky Mountains National Park during Thanksgiving weekend 2016, unexpectedly grew into a catastrophic blaze without precedent in Park history, resulting in substantial property losses to plaintiffs' policyholders. The insurer plaintiffs in these five cases, who are subrogated to those losses, assert tort claims based on two theories of negligence. First, they claim that the Park Service negligently failed to contain the Fire. Second, they claim that the Park Service negligently failed to provide sufficient warnings to the public. The district court correctly dismissed plaintiffs' fire-management allegations as barred by the FTCA's discretionary function exception. But it mistakenly failed to apply the same analysis in allowing plaintiffs' failure-to-warn allegations to proceed.

**I.** The FTCA's discretionary function exception precludes tort actions challenging governmental conduct that involves "an element of judgment or choice" and is "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 322, 325 (1991) (quotation marks omitted). That is true for the various aspects of fire control challenged by plaintiffs—how and when to conduct fire monitoring; what command structure to employ; and which decision-support systems to use. In dismissing plaintiffs' fire-management

allegations, the district court correctly applied this Court's precedents which, like the decisions of other circuits, recognize that the government's decisions when responding to wildfires implicate policy and thus are generally insulated from tort liability.

Plaintiffs do not seriously challenge this conclusion. They focus their efforts instead on the first step of the discretionary-function analysis, urging that various policy statements deprived Park Service officials of all relevant discretion. But plaintiffs fundamentally misunderstand the governing inquiry. The question is not whether Park Service officials acted consistently with general policy or best practice. Officials charged with implementing such policies exercise discretion for purposes of the FTCA unless a mandatory directive "specifically prescribe[s] a course of action for [the] employee[s] to follow," *Gaubert*, 499 U.S. at 322, and thereby forecloses all relevant choice as to "the *precise manner* in which" to carry out their functions, *Rosebush v. United States*, 119 F.3d 438, 442 (6th Cir. 1997) (emphasis in original). The policies cited by plaintiffs provided guidance; they did not "mandate[] that the [Park] Service" monitor the fire, staff its response, or document its fire-response decisions "in any *specific* manner." *Id.* (emphasis in original). Plaintiffs' preoccupation with the cited policies is particularly misplaced given that an inter-agency expert review report specifically found that better implementation

26

of those policies "would likely have *not* led to a different outcome." *NPS Review Report* 57, RE32-9, PageID#3454 (emphasis in original).

**II.** The same principles dictate dismissal of plaintiffs' failure-to-warn allegations. The Park Service's decisions about the timing, nature, and means of its public warnings plainly involved an element of judgment and choice and were susceptible to policy considerations. The district court erred in accepting plaintiffs' contention that Sections 3.3.2(C) and 4.4.2(F), Table 13 of the Park Plan divested Park Service personnel of all relevant discretion in deciding what, how, or when to warn the public, a conclusion that cannot be squared with this Court's precedent or with the district court's own correct resolution of the parallel fire-management allegations.

## STANDARD OF REVIEW

The district court's rulings on a Rule 12(b)(1) motion to dismiss are reviewed de novo. *Hertz v. United States*, 560 F.3d 616, 618 (6th Cir. 2009). Plaintiffs, as the parties seeking to invoke jurisdiction under the FTCA, bear the burden of "facially alleg[ing] matters not excepted by" the discretionary function exception. *Sharp ex rel. Sharp v. United States*, 401 F.3d 440, 443 n.1 (6th Cir. 2005) (quoting *Carlyle v. U.S. Dep't of the Army*, 674 F.2d 554, 556 (6th Cir. 1982)).

**ARGUMENT**

**PLAINTIFFS' NEGLIGENCE CLAIMS FALL WITHIN THE
DISCRETIONARY FUNCTION EXCEPTION**

The Federal Tort Claims Act provides a limited waiver of sovereign

immunity and creates a cause of action for losses "caused by the negligent or

wrongful act or omission of any employee of the Government … under

circumstances where the United States, if a private person, would be liable"

under state law. 28 U.S.C. § 1346(b)(1); *see id.* § 2674. "The substance of

cognizable FTCA claims, however, is further limited" in important respects,

including by the discretionary function exception, which precludes "claims

'based upon the exercise or performance or the failure to exercise or perform a

discretionary function or duty on the part of a federal agency or an employee

of the Government, whether or not the discretion involved be abused.'"

*Jude v. Commissioner of Soc. Sec.*, 908 F.3d 152, 158 (6th Cir. 2018) (quoting

28 U.S.C. § 2680(a)).

The discretionary function exception "marks the boundary between

Congress' willingness to impose tort liability upon the United States and its

desire to protect certain governmental activities from exposure to suit by

private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*

(*Varig Airlines*), 467 U.S. 797, 808 (1984). Its protection "extends beyond high-

28

level policymakers, and includes government employees at any rank exercising discretion." *Kohl v. United States*, 699 F.3d 935, 940 (6th Cir. 2012).

All of the conduct challenged by plaintiffs—including not only their fire-management allegations but also their failure-to-warn allegations—remains immune from suit under this exception.

## A.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS' FIRE-MANAGEMENT ALLEGATIONS ARE BARRED.

With respect to plaintiffs' appeal, the district court properly determined that plaintiffs' various fire-management allegations are facially precluded by the discretionary function exception.

### 1.    Challenged Conduct Is Discretionary Unless Employees Are Directed To Follow A Specific Course Of Action.

At the first step of the discretionary-function analysis, the Court inquires whether a "federal statute, regulation, or policy *specifically prescribes* a course of action for an employee to follow." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (emphasis added) (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). If "the employee has no rightful option but to adhere to [a] directive" in the specific context at issue, the challenged conduct is not discretionary. *Id.* at 322 (quoting *Berkovitz*, 486 U.S. at 536). If, however, there was any "room for judgment or choice in the decision made, then the challenged conduct was discretionary." *Kohl*, 699 F.3d at 940.

This Court has consistently concluded that mandatory language precludes application of the discretionary function exception only when obligations are established with specificity, in a manner precluding any relevant exercise of discretion in their implementation.  Its decision in *Rosebush v. United States*, 119 F.3d 438 (6th Cir. 1997), illustrates the application of these principles with particular clarity.  Plaintiffs there alleged that Forest Service employees violated mandatory requirements to "[p]repare and annually update an operation and maintenance plan for recreation sites"; to "[g]ive health and safety related items highest priority"; to "eliminate safety hazards from recreation sites"; to "inspect each public recreation site annually" and "[m]aintain a record of the inspections and corrective actions"; and to "[i]mmediately correct high-priority hazards that develop" or else "close the site."  *Id.* at 441 (quoting policy provisions).  In rejecting plaintiffs' argument, the Court explained that the "relevant inquiry" was not whether agency policies "mandated that the Forest Service maintain its campsites and fire pits" but, instead, whether those policies directed that they do so "in any *specific* manner" bearing on the plaintiffs' injury.  *Id.* at 442 (emphasis in original).  Because the cited policies did not "require[] that a fire pit be maintained or designed in any particular way," "the Forest Service's decisions as to the *precise*

30

*manner* in which to do so … clearly f[e]ll within the discretionary function exemption to the government's tort liability." *Id.* (emphasis in original).

This Court has repeatedly applied these principles. In *Montez ex rel. Hearlson v. United States*, 359 F.3d 392 (6th Cir. 2004), the Court found that language expressly requiring the Bureau of Prisons to "provide for the protection" and "provide for the safekeeping" of inmates were "of a general nature" that left agency employees with "discretion[] in deciding how to accomplish these objectives." *Id.* at 396. In *A.O. Smith Corp. v. United States*, 774 F.3d 359 (6th Cir. 2014), the Court applied *Rosebush* and *Montez* in concluding that generally worded "operating constraint[s]" imposed by a Water Control Manual in fact preserved "ample discretion to respond to dynamic storm conditions in the way [Army Corps employees] conclude is best." *Id.* at 368-69. In *Sharp ex rel. Sharp v. United States*, 401 F.3d 440 (6th Cir. 2005), the Court concluded that "[v]ery broad statements" in a Forest Service Manual did not eliminate the agency's "discretion in determining how best to carry out [particular] policies" concerning hours of operation and lighting conditions. *Id.* at 444-45. *See also, e.g.*, *Edwards v. Tennessee Valley Auth.*, 255 F.3d 318, 323 (6th Cir. 2001) (applying logic of *Rosebush* in concluding that "TVA ha[d] not adopted any requirement mandating that it maintain the area around the shoreline in a specific manner").

These principles apply with full force to "claims challenging the performance of fire suppression operations," which courts have recognized "are generally barred by the discretionary function exception." *Esquivel v. United States*, 21 F.4th 565, 574 n.6 (9th Cir. 2021).  In *Miller v. United States*, 163 F.3d 591 (9th Cir. 1998), the agency's firefighting plans set forth several mandatory duties, including to "monitor current and recent fire reports to target specific risks" and "directly address[] the fire on the ground." *Id.* at 594. But the court emphasized that "[t]he existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." *Id.* at 595.  The court reasoned that "while the above standards and procedures outline certain requirements for fire suppression, they do not eliminate discretion" because "they did not tell the Forest Service to suppress the fire in a specific manner and within a specific period of time." *Id.*

Similarly, in *Hardscrabble Ranch, LLC v. United States*, 840 F.3d 1216 (10th Cir. 2016), the court rejected the plaintiff's reliance on a Forest Service "Decision Checklist" and other provisions, explaining that "neither the Checklist nor other procedures identified by [plaintiff] explicitly told 'the Forest Service to suppress the fire in a specific manner and within a specific period of time.  The existence of some mandatory language does not eliminate

discretion when the broader goals sought to be achieved necessarily involve an element of discretion.'" *Id.* at 1222 (quoting *Miller*, 163 F.3d at 595).[8]

### 2. Plaintiffs Have Failed To Allege Any Relevant Violations Of Specific, Mandatory Firefighting Directives.

Applying these principles, the district court correctly concluded at the first step of analysis that all of plaintiffs' fire-management allegations are directed to discretionary conduct. Plaintiffs have failed to plausibly allege that Park Service officials lacked relevant discretion regarding how to monitor the fire, staff the command structure of the Park's firefighting response, or utilize particular fire-management decisional tools.

*Fire monitoring.* Plaintiffs have failed to identify a violation of any specific, mandatory directive with respect to their allegation that Park Service

---

[8] *See also, e.g.*, *Ohlsen v. United States*, 998 F.3d 1143, 1161-62 (10th Cir. 2021) ("[T]he directive to 'inspect' the Pueblo's work was 'too general to remove the discretion' from the government's conduct in determining how or when to inspect the Pueblo's work."); *Lam v. United States*, 979 F.3d 665, 679 (9th Cir. 2020) (acknowledging "general requirements," but "the [Plan] does not specify how to carry [them] out"); *Gonzalez v. United States*, 851 F.3d 538, 546 (5th Cir. 2017) ("[E]ven if the standard that 'hazards do not exist on or along the trail' is mandatory, the standard does not dictate how officials must meet that standard—which is what the challenged conduct concerns."); *Elder v. United States*, 312 F.3d 1172, 1177-78 (10th Cir. 2002) (Park Service manual "contain[ed] mandatory safety guidelines," but did not "dictate what actions park employees must take in response to particular problems"); *Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) (Park Service guidelines "can be considered mandatory," but "the means by which NPS employees meet these goals necessarily involves an exercise of discretion").

personnel did not sufficiently monitor the Chimney Tops 2 Fire. Plaintiffs cite policy provisions generally stating that "[a]ll wildland fire events must be monitored," RM-18, ch. 2, § 4, RE32-5, PageID#2213, and that Park Plans should include a "Monitoring schedule" as a "R[equired element]," *id.* ch. 8, Ex. 1, at 1, PageID#2370. *See generally* Park Plan 58, RE32-6, PageID#2618 ("All wildland fires … will be monitored for their effects on the eco-system."). But as plaintiffs themselves acknowledge, "RM-18 does not specify the 'how' or 'when' of fire monitoring," Br. 26, and the document is mere "guidance" in any event, RM-18, ch. 1, at 1, RE32-5, PageID#2193. It therefore did not divest Park Service personnel of relevant discretion in deciding what particular strategy or schedule to employ when monitoring the Chimney Tops 2 Fire.

Plaintiffs do not, for example, cite any requirement for around-the-clock monitoring of smoldering fires that have no visible flame and are located on inaccessible terrain, nor do they explain how any such monitoring could feasibly be conducted at night. Plaintiffs also do not cite any policy precluding Park officials from considering other relevant circumstances, including staffing limitations over a holiday weekend, or from considering what strategies had been successful in responding to other nearby fires.

Plaintiffs' assertion that there was "no monitoring whatsoever for five consecutive nights," Br. 31, even if true, would not constitute a departure from

a specifically prescribed course of conduct.  Indeed, the Park Service's after-action expert report noted that it was "standard protocol" not to "staff the fire overnight." *NPS Review Report* 103, RE32-9, PageID#3500.  The report queried whether, by Sunday night, the Chimney Tops 2 Fire remained "a situation that fell within normal operating parameters" or whether a "more aggressive course of action" would have been appropriate. *Id.* But it treated that matter as a judgment call, not as a breach of some specific requirement.

Plaintiffs' reliance on the Park Service's Fire Monitoring Handbook (Br. 27-31) also fails to advance their claims.  The Handbook expressly states that it is intended only to provide "guidance" and "facilitate and standardize monitoring," not to issue commands to employees, and it nowhere purports to require a Park to adopt the same approach for overnight hours as for daylight conditions.  Handbook ii, RE32-8, PageID#3113.  Moreover, the time intervals cited by plaintiffs (Br. 30) are expressly described as "*recommended* frequencies," not mandatory requirements.  Handbook ii, RE32-8, PageID#3113 (emphasis added).  The Handbook thus is not a source of any specific directives that could have been violated. *Cf., e.g.*, *Buckler v. United States*, 919 F.3d 1038, 1048 (8th Cir. 2019) (holding that agency handbook "lack[ed] the required specificity and mandatory language," and that mere "use of the term 'shall' does not reflect an absence of discretion"); *Gonzalez v.*

35

*United States*, 851 F.3d 538, 546 (5th Cir. 2017) (Handbook standard providing that "hazards do not exist on or along the trail," even if mandatory, "d[id] not dictate how officials must meet that standard—which is what the challenged conduct concerns"); *Hart v. United States*, 630 F.3d 1085, 1090-91 (8th Cir. 2011) (presence of "imperative language" in Handbook did not override that "[b]y its terms, the Handbook merely 'establishes guidelines'").

*Command structure.*  The district court likewise correctly rejected plaintiffs' arguments concerning the Park's command staffing decisions in responding to the Chimney Tops 2 Fire.  Plaintiffs principally assert that the Park transgressed alleged directives contained in the "Redbook," officially known as the Interagency Standards for Fire and Aviation Operations.  But the Redbook is a government-wide compilation of guidance and best practices, not a set of instructions to specific employees.  Indeed, as the district court noted, the Redbook specifically "says it does not give 'absolute rules'" but "'require[s] judgment in application.'"  Op. 24, RE51, PageID#3961 (quoting Redbook 10, RE32-7, PageID#2681).  The Park Service's DO-18 and Park Plan likewise confirm the discretion of Park employees to determine "the safest, most effective, and most efficient means available" to respond to a fire "while meeting identified fire management unit goals and objectives," including by "determining the need for and assignment of [a] Fire Duty Officer."  Park Plan

30, 40, RE32-6, PageID#2590, 2600; *see* DO-18 at 1, 5, RE32-4, PageID#
2178, 2182 (indicating that DO-18 reflects only "basic principles and strategic
guidelines" and recognizing that "[t]he circumstances under which a fire
occurs, and the likely consequences on firefighter and public safety and welfare
… dictate the appropriate response to the fire").

On appeal, plaintiffs emphasize that the expert review report criticized
the Park for allowing the same person (Officer Salansky) to perform concurrent
fire-response functions and characterized that result as "contrary to 2016
Redbook policies," *NPS Review Report* 31, 36, RE32-9, PageID#3428, 3433.
As the district court correctly recognized, however, the expert review was
undertaking a policy-driven inquiry that noted any and all departures from best
practices, not making "legal conclusion[s]" about whether Park Service
personnel transgressed specific limits on their authority. *See* Op. 7-9, RE51,
PageID#3944-46. A review team's characterization of particular decisions as
"contrary to" best practice does not mean that the practice was mandatory.
The discretionary function exception applies "whether or not the discretion …
[is] abused," even though an abuse of discretion is never likely to be consistent
with best practices. 28 U.S.C. § 2680(a). The question for discretionary
function purposes is whether relevant sources such as the Redbook and the
Park Plan dictated a specific course of action. They did not.

Plaintiffs' arguments in this regard are particularly anomalous because the expert report on which they rely—whose "findings" they urge must be "accepted … as true," Br. 33, 38—specifically found that the departure from best practices likely had no impact on the course of events. The report's observation that "the FMO was simultaneously serving as the duty officer and incident commander" was one "that would likely have *not* led to a different outcome on the Chimney Tops 2 Fire." *NPS Review Report* 57-59, RE32-9, PageID#3454-56 (emphasis in original).[9] Thus, even taken on plaintiffs' own terms, their suggestion that a "domino effect of consequences" (Br. 20) might have unfolded from use of a different "command structure" does not rise even to the level of plausible speculation. *Cf., e.g.*, *Montijo-Reyes v. United States*, 436 F.3d 19, 26 (1st Cir. 2006) (dismissing claims under discretionary function exception where the plaintiffs identified no "causal connection between the [alleged] violation and their asserted damages"); *Fisher Bros. Sales v. United States*, 46 F.3d 279, 285 (3d Cir. 1995) (en banc) (rejecting similar effort to "look[] behind" the ultimate "injury-causing decision" and instead challenge earlier alleged policy violations).

---

[9] In contrast, the expert team made other findings and recommendations that, if implemented, "*would likely* result in a different outcome on a future Chimney Tops 2 type complexity fire." *NPS Review Report* 59-60, RE32-9, PageID#3456-57 (emphasis in original).

*Use of WFDSS*.  The district court also correctly rejected plaintiffs'
assertion that Park Service officials transgressed specific, mandatory
constraints on their discretion in how they documented their fire-response
decisions.  Plaintiffs argue that RM-18 and the Park Plan required Park Service
personnel to utilize a specific web-based decision support process (the
WFDSS) to memorialize and structure their decisions.  As the district court
emphasized, however, "the RM-18 is discretionary by its own terms and
allow[s] employees and the [Park Service] to use discretion."  Op. 26, RE51,
PageID#3963.  The Park Plan likewise did not mandate use of one specific
decision-support process, instead calling for "WFDSS[] *or equivalent*" and
advising that "[t]he level of decision support documentation required will
depend on the fire response level."  Park Plan 30, RE32-6, PageID#2590
(emphasis added).  Indeed, as the district court recognized, "when the
objective is to manage a fire, the [Park Plan] gives broad discretion to the [Park
Service] and its employees to determine the most efficient, safe, and best tactics
to address the fire, which would include using a decision support system."
Op. 26, RE51, PageID#3963.

Plaintiffs emphasize the review report's observation that their preferred
decisional tool—the WFDSS—was not used prior to the Fire's spread beyond
Park boundaries.  *See NPS Review Report* 38, RE32-9, PageID#3435.  As with

39

its discussion of command structure, the expert review did not purport to find that Officer Salansky or his colleagues were under a specific, mandatory obligation to use the WFDSS at any particular point in time.  Their report also did *not* find that earlier use of the WFDSS would have led to implementation of a different firefighting strategy and, hence, potentially a "different outcome" for the Fire.  *Cf. NPS Review Report* 59, RE32-9, PageID#3456.  As described by the report, WFDSS is a tool "to document the decision-making process and outline the strategy and tactics employed," *id.* at 37, PageID#3434, not a vehicle for supplanting firefighters' judgment.  And Park personnel indisputably utilized other decisional tools, including performance of a complexity analysis on Friday, November 25; "two four-day Near Term Fire Behavior (NTFB) runs done by a geospatial analyst" on Saturday; and a "Relative Risk Assessment" on Monday afternoon.  *Id.* at 38, 52, PageID#3435, 3449.  Because "past [fire suppression] practice had always worked in the past," consultation of the WFDSS would likely have simply reaffirmed the same basic fire-suppression strategy.  *Id.* at 55, Page#3452.

In any event, regardless of the WFDSS's output, Park Service officials indisputably retained ultimate discretion to make their own policy-based decisions about how to fight the fire.  Plaintiffs' allegation here fails for the same reason as in *Hardscrabble Ranch*, where the plaintiffs similarly alleged that

40

the agency had "failed to follow [a] mandatory directive to conduct daily monitoring in the Wildland Fire Decision Support System [WFDSS]." *Hardscrabble Ranch*, 840 F.3d at 1222.  The court explained that, regardless of what decisional tools were consulted, the cited policy "did not remove all discretion in how the USFS" ultimately responded to the fire.  *Id.*; *see also, e.g.*, *In re Katrina Canal Breaches Litig.*, 696 F.3d 436, 449-50 (5th Cir. 2012) (holding that Army Corps' failure to follow mandated NEPA consultation procedures did not defeat application of the discretionary function exception where the "agency retain[ed] substantive decisionmaking power regardless" of what it might have learned from those procedures).

### 3.    Plaintiffs' Fire-Management Allegations Challenge Conduct Susceptible To Policy Analysis.

The district court also correctly concluded that the challenged fire-management decisions remain protected at the second step of analysis.

At this step, the Court inquires whether the judgment exercised was "of the kind that the discretionary function exception was designed to shield," *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536)— that is, whether it "involve[d] the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 537.  "The focus of the inquiry is … on the nature of the actions taken and on whether they are susceptible to policy analysis," not on the employee's "subjective intent" or actual decisionmaking process.  *Gaubert*,

499 U.S. at 325. Moreover, as *Gaubert* expressly held and this Court has repeatedly reaffirmed, if the relevant conduct is discretionary at the first step of analysis, then "there is a 'strong presumption' that [the challenged] conduct meets the second part of the *Gaubert* test as well." *A.O. Smith Corp.*, 774 F.3d at 371; *see also, e.g.*, *Kohl*, 699 F.3d at 940; *Montez*, 359 F.3d at 397; *Rosebush*, 119 F.3d at 443-44.

With or without this "strong presumption," the Park Service's choices about how to monitor, staff, and document strategy concerning the Fire were plainly susceptible to policy considerations. "[D]ecisions regarding how to perform fire suppression operations are policy-based decisions covered by the discretionary function exception," *Esquivel*, 21 F.4th at 575, because they "involve[] a balancing of considerations, including cost, public safety, firefighter safety, and resource damage," *id.* (quoting *Miller*, 163 F.3d at 595). Indeed, the Park Plan expressly calls for officials to "suppress the fire at the lowest cost with the fewest negative consequences with respect to firefighter and public safety" and, in light of "the fire season, current and expected weather, [and] current and anticipated fire behavior," to select "the best tactics to mitigate risks to the public and firefighters, meet protection priorities, while also meeting cultural/natural resource management objectives." Park Plan 30, RE32-6, PageID#2590. And because those operational decisions are "rooted

in policy, the discretionary function exception extends to all other conduct 'based upon the exercise or performance' of these operations." *Esquivel*, 21 F.4th at 576.

That is plainly the case with respect to each of plaintiffs' fire-management allegations. Park officials could have concluded that overnight monitoring of the fire would consume severely constrained resources and present risks to firefighter safety without yielding any material offsetting benefits. They also could have decided, particularly in light of holiday staffing constraints, that centralizing incident-command and fire-monitoring leadership in Officer Salansky was preferable as a policy matter to forcing other, potentially less experienced or less available persons to assume such responsibility. And they could have reasonably decided that active, on-the-ground, ad hoc coordination among Park leaders, officials, and firefighters provided better decisional support than would use of a web-based decisional tool like WFDSS. Such "decisions regarding the allocation of fire suppression resources are grounded in public policy." *Miller*, 163 F.3d at 596; *see also, e.g.*, *Foster Logging, Inc. v. United States*, 973 F.3d 1152, 1164-66 (11th Cir. 2020) (agreeing that government's "conduct in observing, monitoring, and maintaining of a forest fire" involved protected policy considerations); *Hardscrabble Ranch*, 840 F.3d at 1222-23 (same).

43

### 4.    Plaintiffs' Other Contentions Are Without Merit.

Plaintiffs' remaining contentions on appeal, none of which identify a violation of any relevant specific, mandatory directive, do not fare any better. In asserting that their fire-management allegations should survive threshold dismissal, plaintiffs place "controlling" reliance (Br. 36) on the Supreme Court's decision in *Rayonier Inc. v. United States*, 352 U.S. 315 (1957).  But *Rayonier* is irrelevant to the jurisdictional analysis, as the Supreme Court itself has since explained.  In *Rayonier*, the Court had concluded that "the liability of the United States under the [FTCA] is not restricted to that of a municipal corporation or other public body" under state law, *Varig Airlines*, 467 U.S. at 813 n.10, meaning that, on the merits, the government may be held liable to the same extent as a private landowner under "the good samaritan doctrine," *Myers v. United States*, 17 F.3d 890, 904 (6th Cir. 1994) (citing *Rayonier*, 352 U.S. at 318).  But *Rayonier* left "undisturbed" the Supreme Court's case law on the discretionary function exception.  *Varig Airlines*, 467 U.S. at 813 n.10.  And as this Court has held, to plead jurisdiction, a plaintiff must "facially alleg[e] matters" that fall outside the discretionary function exception.  *Carlyle*, 674 F.2d at 556.  *Rayonier* thus does nothing to advance plaintiffs' appeal. *Accord, e.g.*, *Foster Logging*, 973 F.3d at 1161 n.8 ("*Rayonier* does not resolve whether the discretionary-function exception operates to bar suit for alleged

negligence in failing to control a forest fire."); *Miller*, 163 F.3d at 596-97

(same); *U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 123 (3d Cir. 1988).

Plaintiffs' assertion that "[p]rotecting the public from deadly wildfires …

is not a 'discretionary' matter" like "decorating government offices," Br. 15,

likewise fundamentally misunderstands the inquiry.  A matter is not a

protected "discretionary" function under section 2680(a) only if it is non-

essential or unimportant.  On the contrary, the key purpose of the discretionary

function analysis is to "mark[] the boundary between" routine claims of

negligence (which are actionable under the FTCA) and those that challenge

policy-based decisionmaking (which are not).  *Varig Airlines*, 467 U.S. at 808.

The very fact that "public safety" is, indeed, of vital importance (Br. 15) only

underscores the sensitive, policy-based nature of the decisions that must be

made when considering public safety alongside other values, including

firefighter safety, natural conservation and ecological concerns, allocation of

scarce staff and material resources, and the Park's other operational needs.

Finally, plaintiffs' assertion that "the vast majority of cases adjudicating

the discretionary function exception are decided following the completion of

related discovery and an evidentiary hearing" (Br. 57) is both empirically

dubious and, in any event, identifies no error in the district court's decision.

Plaintiffs do not argue that additional discovery was needed to determine what

policies applied to the Park Service when responding to the Chimney Tops 2

Fire.  On the contrary, plaintiffs themselves had already identified those

policies in their own complaints.  The district court acted properly in

adjudicating the government's motion to dismiss and granting that motion

upon finding that plaintiffs had not "facially allege[d] matters" falling outside

the discretionary function exception.  *Carlyle*, 674 F.2d at 556.

## B.    PLAINTIFFS' FAILURE-TO-WARN ALLEGATIONS ALSO FALL WITHIN THE DISCRETIONARY FUNCTION EXCEPTION.

The same legal principles apply with equal force to the failure-to-warn

allegations, which are the subject of the United States' cross-appeal.  The Park

Service's operational decisions about what, when, and how to warn the public

about the Chimney Tops 2 Fire plainly involved choice and discretion, and

plaintiffs have not identified any statute, regulation, or policy that specifically

prescribed any particular course of action to take for warning about the Fire.

Moreover, Park Service personnel necessarily had to make policy-informed

judgments in evaluating the nature of the threat posed by the Chimney Tops 2

Fire (both at the outset and as conditions evolved); in determining what types

of warnings were warranted; and in selecting the most effective means of

communicating those warnings.

**1.    No Specific, Mandatory Directive Dictated What, When, Or How To Warn The Public About The Fire.**

As previously explained (*supra* pp. 29-33), at the first step of the discretionary-function analysis, the Court inquires whether a "'federal statute, regulation, or policy *specifically prescribes* a course of action for an employee to follow.'" *Gaubert*, 499 U.S. at 322 (emphasis added) (quoting *Berkovitz*, 486 U.S. at 536). That test is not satisfied where a policy imposes a general mandate. Rather, the question is whether the policy dictates the "*specific manner*" in which to act in a way that divests employees of all meaningful judgment or choice. *Rosebush*, 119 F.3d at 442. "[W]here, as here, a government agent's performance of an obligation requires that agent to make judgment calls, the discretionary function exception applies." *Gonzalez v. United States*, 814 F.3d 1022, 1029 (9th Cir. 2016); *accord, e.g.*, *Gonzalez*, 851 F.3d at 550 (if a policy mandates a standard but "leaves it to a federal agency or employee to determine when and how to take action, … the exercise of its authority is discretionary").

The only policy provisions cited by plaintiffs fall well short of constituting any such specific directive. First, a bullet point in Plan Section 3.3.2, subdivision C, identifies as a "Management Consideration" that "Park neighbors, Park visitors and local residents will be notified of all planned and unplanned fire management activities that have the potential to impact them."

47

Park Plan 28, RE32-6, PageID#2588.  Second, Table 13 within Section 4.4.2, subdivision F—a chart listing "mitigation actions required to protect values at risk and to ensure the safety of park staff and visitors as well as the neighboring public"—contains bullet points stating that the Park will "Inform park neighbors of wildland fires"; "Post current fire information on websites as available"; and "Use information officer and/or park public affairs to disseminate information."  *Id.* at 55, PageID#2615.  *See supra* pp. 22-23.

Those statements did not divest Park Service employees of all meaningful discretion.  As an initial matter, the document at issue—the Park Plan—is simply an agency planning document, which "provides long-term direction for achieving park goals related to human safety and ecosystem management" and "outlines those actions that will be taken by Great Smoky Mountains National Park in meeting the fire management goals for the park." Park Plan 5, RE32-6, PageID#2565.  Consistent with that purpose, various provisions of the Park Plan expressly contemplate that personnel responding to wildfires will have to exercise discretion.  *See, e.g.*, *id.* at 30, PageID#2590 ("wildfire managers may apply different strategies and tactics as part of the fire response" and consider various factors to determine "the best tactics to mitigate risks to the public and firefighters").  Section 4 of the Plan, in which Table 13 is contained, is expressly entitled "Wildland Fire Operational

*Guidance*." *Id.* at 29, PageID#2589 (emphasis added). That isolated provisions of the Plan are couched in mandatory language does not transform the document's fundamental character as one intended to inform personnel's exercise of discretion, not to divest it. *See, e.g.*, *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 859 (4th Cir. 2016) (warning that "[i]t would be the rare guidance manual that did not contain some arguably mandatory language," and reasoning that "'[t]he price of circulating internal guidance should not be an exponential increase'" in tort liability); *Aragon v. United States*, 146 F.3d 819, 824-25 (10th Cir. 1998) (manual's "express qualification" that it was "'intended for guidance'" "weigh[ed] heavily against" any conclusion that the manual "prescribed mandatory directives for the Air Force to follow").

Here, Plan Sections 3.3.2(C) and 4.4.2(F), Table 13 enumerate "[c]onsiderations" and general objectives without prescribing a specific course of conduct. Park Plan 28, 55, RE32-6, PageID# 2588, 2615. The statements reflect that Park Service employees "shall" provide notice, in some unspecified way and at some unspecified time, if they identify a "potential to impact" Park visitors or neighbors. But those statements do not specify any operative conditions under which particular notice is required (notwithstanding that the Park Plan's drafters could have done so in reference to technical measures for forecasting a wildfire's spread). Indeed, the cited statements do not even

49

define the key terms they use (*e.g.*, "fire management activities"; "potential to impact"; "Park neighbors"). As a result, Park Service officials necessarily retained discretion to decide when any of their "fire management activities" presented a "potential to impact" persons outside the Park; when, in what form, and to whom any notice should be directed; and what specific instructions or warnings to provide in that notice. *Id.*

Indeed, the predicate judgments necessarily required by Sections 3.3.2(C) and 4.4.2(F) are themselves sufficient to preserve the discretionary character of the challenged conduct. Even when a particular "course of action 'must' follow, the decision whether [an] antecedent condition exists afforded sufficient discretion to satisfy the first prong of the *Gaubert* test." *A.O. Smith Corp. v. United States*, 774 F.3d 359, 365-66 (6th Cir. 2014); *see also id.* at 365 (relying upon this Court's prior decision in *Myers*, which "held that the protocols to be followed by Mine Safety and Health Administration inspectors were 'replete with choice'" because "[a]ll the directives used an 'if/then' framework that 'required the inspectors to make a particular assessment prior to acting'") (quoting *Myers*, 17 F.3d at 895); *Jude*, 908 F.3d at 160-61.

The claims here also parallel in relevant respects those in *Schurg v. United States*, 63 F.4th 826 (9th Cir. 2023), in which a published incident decision for the forest fire in question "directed the Forest Service to '[c]onsult with private

landowners and local fire district authorities if suppression activities have a high probability of occurring on private lands.'" *Id.* at 833. In addition, a letter from the team leadership "specified that the team could not deviate from the published incident decision without issuing a new decision." *Id.* But the court concluded that neither the incident decision nor the letter "'specifically prescribed a particular course of action by the Forest Service.'" *Id.* (quoting *Miller*, 163 F.3d at 594). In particular, they "did not dictate when or how the Forest Service was to consult with private landowners and did not require the Forest Service to consult with landowners individually." *Id.*; *see id.* (citing *Green v. United States*, 630 F.3d 1245, 1251 (9th Cir. 2011), as holding that a plan requiring the Forest Service to develop a map of private land and record landowners' contact information was a mere "objective" involving an element of choice because it did not "'dictate[] the precise manner in which the agency [was] to complete the challenged task'"). The court concluded: "In the absence of such directives, the Forest Service necessarily had to choose the best way to publicize information about the fire." *Id.*

The same is true here. Park Service officials had to exercise judgment in deciding whether—and at what point—the Chimney Tops 2 Fire (or, more precisely, their "fire management activities" in response to that fire) had the "potential to impact" neighboring residents, and then how urgently to act in

turn.  Park Plan 28, RE32-6, PageID#2588.  Thus, even assuming that

Sections 3.3.2(C) and 4.4.2(F), Table 13 of the Plan created a mandatory duty

to warn in some circumstances, they certainly did not dictate "the *precise*

*manner* in which" to communicate with the public and local officials about the

fire.  *Rosebush*, 119 F.3d at 442.[10]

### 2.    The District Court Erred In Its Abbreviated Analysis Of The Failure-To-Warn Allegations.

The district court mistakenly concluded that plaintiffs' failure-to-warn

allegations survived facial dismissal under the discretionary function exception

because of the generally worded objectives in Sections 3.3.2(C) and 4.4.2(F),

Table 13 of the Park Plan.  The district court summarily concluded that the

Plan "is best read to contain some provisions that require mandatory conduct

and other provisions that allow discretion," and while the "[Plan] gave [Park

Service] employees discretion when monitoring fires, the same cannot be said

---

[10] *See also, e.g.*, *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 335-36 (3d Cir. 2012) ("[N]o statute, regulation, or policy mandated any particular method for warning about marine hazards at Buck Island."); *Bailey v. United States*, 623 F.3d 855, 861 (9th Cir. 2010) (manual "strip[ped] the Corps of its discretion *whether* to replace missing or damaged" warning signs, but "d[id] not create a … specific directive regarding *when* the Corps" must act, thus preserving employee discretion); *Blackburn v. United States*, 100 F.3d 1426, 1431 (9th Cir. 1996) ("[T]he [Park Service] policy manuals' broad mandate to warn the public of … special hazards involves the exercise of discretion in identifying such hazards, in determining which hazards require an explicit warning[,] and in determining the precise manner in which to warn it of those hazards.").

for notifying others about fires."  Op. 18-19, RE51, PageID#3955-56.  But as already discussed at length, the determinative question at step one is not simply whether the Plan provision is "mandatory."  *Cf. id.*  It does not suffice that a policy uses compulsory language.  Rather, it must "*specifically prescribe*[] a course of action" to follow, leaving no room for judgment or choice about how to implement that requirement.  *Gaubert*, 499 U.S. at 322 (emphasis added) (quoting *Berkovitz*, 486 U.S. at 536); *see generally Rosebush*, 119 F.3d at 442.

The district court acknowledged, yet failed to meaningfully consider, the question whether the general statements contained in Sections 3.3.2(C) and 4.4.2(F) were "enough to eliminate" meaningful discretion in deciding when and how to warn the public.  Op. 19, RE51, PageID#3956.  It instead stated that the government's arguments "ha[d] already been addressed in *Reed*," a decision previously issued by a different judge in the individual cases.  *Id.* at 21, PageID#3958 (citing *Reed v. United States*, 426 F. Supp. 3d 498 (E.D. Tenn. 2019) (Phillips, J.)).  But the *Reed* decision itself placed improper weight on its threshold determination that Sections 3.3.2(C) and 4.4.2(F) were "mandatory" without addressing whether those provisions prescribed a specific course of action that Park Service employees had allegedly failed to undertake.  *Cf., e.g.*, *Reed*, 426 F. Supp. 3d at 508 ("[T]he Court is not convinced that the [Park Plan] … merely contains guidelines …."); *id.* at 509 ("[T]he relevant portions

53

of [Section] 3.3.2 and Table 13 are all phrased as requirements to act ...."); *id.*
at 511 (asserting that Plan sections "are phrased as requirements to notify").
*Reed* thus failed to consider how the cited Plan provisions could be read to
have required any particular notice to be provided to any specific recipients at
any certain time, in any manner different than what the Park Service actually
did. *See generally supra* pp. 7-13 (describing various forms of public notice
actually provided with respect to the Chimney Tops 2 Fire).[11]

The decision in *Reed* observed that "while regulations may fail to specify
how and when they are to be implemented, they may nonetheless be non-
discretionary as to *whether* they are to be implemented." *Reed*, 426 F. Supp. 3d
at 505. But plaintiffs' allegations do not describe any total lack of
"implement[ation]," and such an assertion would be without basis. On the
contrary, plaintiffs' complaint (Am. Compl. ¶¶ 244-263, RE32, PageID#1976-
80) and the expert report on which they principally rely (*NPS Review Report* 38-

---

[11] To the extent it addressed the issue of specificity at all, *Reed* rejected
the understanding that Park Service officials retained judgment and choice
when deciding how to implement Section 3.3.2 and 4.4.2, Table 13 on the
theory that those provisions did not contain the particular "'if/then' language"
at issue in *Myers*. *Reed*, 426 F. Supp. 3d at 510. But this Court's decisions
applying *Myers* have not held conduct to be discretionary only if it is framed in
an expressly conditional syntactical structure. On the contrary, this Court asks
the substantive question whether any "predicate determination" or "antecedent
condition" involving judgment and choice is necessary in effectuating the cited
requirement. *Jude*, 908 F.3d at 160; *A.O. Smith Corp.*, 774 F.3d at 365-66.

39, RE32-9, PageID#3435-36) acknowledge various forms of public notice issued about the Chimney Tops 2 Fire, and thus have not identified any total failure to "inform[]" "Park neighbors" of the fire. *Reed*, 426 F. Supp. 3d at 510.

Plaintiffs argue, instead, that the various forms of notice provided by the Park Service should be held legally "insufficient" to satisfy the general standards of Sections 3.3.2(C) or 4.4.2(F), as plaintiffs themselves would construe them. Am. Compl. ¶ 262, RE32, PageID#1979. But plaintiffs do not identify any additional, different, or earlier forms of notice that were specifically required by those provisions. Indeed, plaintiffs have not even attempted themselves to identify any particular forms of notice that they believe the public should have received and that Park employees had no "rightful option but to" provide. *Gaubert*, 499 U.S. at 322. Plaintiffs' invitation to hold the Park Service to have "violated" the general objectives of Sections 3.3.2(C) or 4.4.2(F) thus reflects precisely the kind of "second-guessing" of policy-driven decisionmaking that Congress intended to insulate from challenge under the FTCA. *Varig Airlines*, 467 U.S. at 814.[12]

---

[12] The United States' cross-appeal in these insurer cases is from the district court's ruling on a facial motion to dismiss. Following the court's adverse ruling in *Reed*, the United States filed a renewed, factual motion to dismiss in the individual cases that explained that even if Park Plan Sections

*Continued on next page.*

**3.      Decisions About What, When, And How To Warn The Public Are Susceptible To Policy Analysis.**

The conduct challenged by the failure-to-warn allegations also remains immune at the second step of analysis.  As previously noted (*supra* p. 42), where (as here) conduct is found to be discretionary at the first step, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  *Sharp*, 401 F.3d at 443 (quoting *Gaubert*, 499 U.S. at 324).  But even if that presumption did not exist, it is obvious that decisions about when and how to warn the public of hazards are "susceptible to policy analysis."  *A.O. Smith Corp.*, 774 F.3d at 370 (quoting *Gaubert*, 499 U.S. at 325).

The purpose of a warning is to influence the behavior of the public and other government officials in the face of a particular hazard.  Questions about

---

3.3.2(C) and 4.4.2(F) required certain actions, the Park Service had taken those actions, thereby preserving the government's immunity.  *See Gaubert*, 499 U.S. at 324 (explaining that "if a regulation mandates particular conduct[] and the employee obeys the direction," section 2680(a) applies to shield that conduct).  In ruling on that factual attack, the district court in *Reed* acknowledged that the United States had tendered evidence in support of its compliance with Sections 3.3.2(C) and 4.4.2(F) of the Park Plan.  The court declined to accept that evidence as dispositive only because it desired more detail:  it faulted the government for "not provid[ing] the Court with the list of individuals and entities that received the press releases or E-Blast" and not producing "declarations or deposition testimony" about the contents of "communications between the Park's leadership and Gatlinburg officials."  Mem. Op. 18-19, *Reed v. United States*, No. 3:18-cv-201 (E.D. Tenn. Sept. 8, 2020), Dkt. No. 87.  But nothing in the text of Sections 3.3.2 and 4.4.2 mandated those specific forms of notice to begin with, much less required the government to tender any particular evidence to a reviewing court.

whether, when, and how to raise public alarm inherently involve policy-laden judgments about whether a relevant risk has become substantial enough to merit widespread attention; what specific information should be shared; what (if any) responsive actions should be encouraged or directed; and whether, particularly in the face of uncertainty, there are any countervailing considerations that counsel in favor of a delayed or moderated response. Indeed, this Court has recognized that "the government is 'generally shielded from tort liability' in deciding whether to warn of potential dangers," stating that "it is the type of decision that 'fit[s] within the second prong of the discretionary function test.'" *A.O. Smith Corp.*, 774 F.3d at 369; *see, e.g.*, *Sharp*, 401 F.3d at 445 ("[d]ecisions protected from tort liability" generally include: "the proper response to hazards" and "whether to warn of potential dangers"); *Rich v. United States*, 119 F.3d 447, 452 (6th Cir. 1997) (similar); *Rosebush*, 119 F.3d at 443 ("[T]he decision whether to warn of potential danger is a protected discretionary function."); *accord, e.g.*, *Schurg*, 63 F.4th at 834 (concluding that "Forest Service's decisions about notifying the landowners about fire-suppression activities … are susceptible to a policy analysis"); *Clendening v. United States*, 19 F.4th 421, 436 (4th Cir. 2021) (recognizing policy choices inherent in government's "decision not to provide additional, earlier, or more urgent warnings").

57

Plaintiffs believe, with the benefit of hindsight, that earlier and more forceful public warnings by Park officials would have been desirable to the extent that they may have afforded Park neighbors greater opportunity to avoid or mitigate potential property losses from the Fire's spread.  Even accepting any criticisms about the precise timing and content of public communications that the Park decided to employ in this instance, however, Congress has specifically precluded litigation over discretionary judgments "whether or not the discretion involved be abused."  28 U.S.C. § 2680(a); *see Rosebush*, 119 F.3d at 442.

## CONCLUSION

For the foregoing reasons, the district court's November 24, 2020 order should be reversed as to the failure-to-warn allegations and affirmed as to the fire-management allegations, and remanded with instructions to dismiss the complaints in their entirety.

Respectfully submitted,

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MARK B. STERN
 /s/ *Jeffrey E. Sandberg*
JEFFREY E. SANDBERG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7214*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4453*
  *jeffrey.e.sandberg@usdoj.gov*

  *Counsel for the United States*

JULY 2023

59

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(B) because it contains 12,888 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

*/s/ Jeffrey E. Sandberg*
Jeffrey E. Sandberg
*Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey E. Sandberg*
Jeffrey E. Sandberg
*Counsel for the United States*

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Circuit Rules 28(b)(1)(A)(i) and 30(g)(1), the government

designates the following district court documents as relevant:

*Auto-Owners Ins. Co., et al. v. United States*, No. 3:19-cv-478:

| Record Entry | PageID# | Description (Date) |
|---|---|---|
| 32 | 171-234 | Amended Complaint for Damages Under the Federal Tort Claims Act (Mar. 4, 2020) (Am. Compl.) |
| 32-4 | 2177-2187 | Ex. D: National Park Service (NPS), *Director's Order #18: Wildland Fire Management* (2008) (DO-18) |
| 32-5 | 2188-2559 | Ex. E: NPS, *Reference Manual 18: Wildland Fire Management* (2014) (RM-18) |
| 32-6 | 2560-2646 | Ex. F: NPS, *Great Smoky Mountains National Park: Fire Management Plan* (2010) (Park Plan) |
| 32-7 | 2647-3109 | Ex. G: *Interagency Standards for Fire and Fire Aviation Operations* (2016) (Redbook) |
| 32-8 | 3110-3395 | Ex. H: NPS, *Fire Monitoring Handbook* (2003) (Handbook) |
| 32-9 | 3396-3513 | Ex. I: NPS, *Chimney Tops 2 Fire Review: Individual Fire Review Report* (2017) (*NPS Review Report*) |
| 32-10 | 3514-3677 | Ex. J: ABS Group, *After Action Review of the November 28, 2016, Firestorm* (2017) (*ABS Group Report*) |
| 36-1 | 3717-3749 | Defendant United States of America's Memorandum in Support of Motion to Dismiss for Lack of Jurisdiction (Mar. 13, 2020) |
| 39 | 3755-3789 | Plaintiffs' Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Apr. 3, 2020) |
| 41 | 3794-3797 | Amended Notice of Adoption of Response in Opposition to Motion to Dismiss (Apr. 6, 2020) |
| 42 | 3867-3891 | Defendant United States of America's Reply in Support of its Motion to Dismiss for Lack of Subject Matter Jurisdiction (Apr. 24, 2020) |
| 46 | 3898-3906 | Defendant United States of America's Memorandum of Law Regarding the Chimney Tops 2 Fire Review Report (June 18, 2020) |

| 47 | 3907-3918 | Plaintiffs' Supplemental Brief Regarding the National Park Service's Fire Review Report (June 18, 2020) |
| 48 | 3919-3931 | Defendant United States of America's Response to Plaintiffs' Supplemental Briefs Regarding Chimney Tops 2 Fire Review Report (June 25, 2020) |
| 49 | 3932-3936 | Plaintiffs' Response to Defendant United States of America's Memorandum of Law Regarding the Chimney Tops 2 Fire Review Report (June 25, 2020) |
| 51 | 3938-3965 | Memorandum Opinion and Order (Nov. 24, 2020) |
| 145 | 4865-4883 | Memorandum Opinion and Order (Nov. 7, 2022) |
| 147 | 4890-4895 | Plaintiffs' Amended Joint Notice of Appeal (Nov. 11, 2022) |

***State Farm Fire & Cas. Co., et al. v. United States*, No. 3:19-cv-470:**

| Record Entry | PageID# | Description (Date) |
|---|---|---|
| 1 | 1-47 | Complaint (Nov. 19, 2019) |
| 41-1 | 1459-1488 | Defendant United States of America's Memorandum in Support of Motion to Dismiss for Lack of Jurisdiction (Feb. 7, 2020) |
| 45 | 1496-1524 | Plaintiffs' Response in Opposition to Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Mar. 26, 2020) |
| 46 | 1565-1591 | Defendant United States of America's Reply in Support of its Motion to Dismiss for Lack of Subject Matter Jurisdiction (Apr. 24, 2020) |
| 50 | 1598-1612 | Plaintiffs' Supplemental Brief re: NPS Report (June 18, 2020) |
| 51 | 1613-1621 | Defendant United States of America's Memorandum of Law Regarding the Chimney Tops 2 Fire Review Report (June 18, 2020) |
| 52 | 1622-1634 | Defendant United States of America's Response to Plaintiffs' Supplemental Briefs Regarding Chimney Tops 2 Fire Review Report (June 25, 2020) |
| 53 | 1635-1641 | Plaintiffs' Response Brief in Opposition to Defendant United States of America's Memorandum of Law Regarding the Chimney Tops 2 Fire Review Report (June 25, 2020) |

| 54 | 1642-1669 | Memorandum Opinion and Order (Nov. 24, 2020) |
| 146 | 2533-2551 | Memorandum Opinion and Order (Nov. 7, 2022) |
| 148 | 2558-2563 | Plaintiffs' Amended Joint Notice of Appeal (Nov. 11, 2022) |

### *American Reliable Ins. Co., et al. v. United States*, No. 3:19-cv-469:

| Record Entry | PageID# | Description (Date) |
|---|---|---|
| 1 | 1-16 | Complaint  (Nov. 18, 2019) |
| 49 | 1684-1711 | Memorandum Opinion and Order (Nov. 24, 2020) |
| 139 | 2552-2570 | Memorandum Opinion and Order (Nov. 7, 2022) |
| 141 | 2577-2582 | Plaintiffs' Amended Joint Notice of Appeal (Nov. 11, 2022) |

### *United Services Auto. Ass'n, et al. v. United States*, No. 3:19-cv-472:

| Record Entry | PageID# | Description  (Date) |
|---|---|---|
| 1 | 1-142 | Complaint  (Nov. 19, 2019) |
| 32 | 1618-1645 | Memorandum Opinion and Order (Nov. 24, 2020) |
| 123 | 2489-2507 | Memorandum Opinion and Order (Nov. 7, 2022) |
| 125 | 2514-2519 | Plaintiffs' Amended Joint Notice of Appeal (Nov. 11, 2022) |

### *Allstate Fire & Cas. Ins. Co., et al. v. United States*, No. 3:19-cv-474:

| Record Entry | PageID# | Description (Date) |
|---|---|---|
| 1 | 1-1353 | Complaint  (Nov. 20, 2019) |
| 33 | 1585-1612 | Memorandum Opinion and Order (Nov. 24, 2020) |
| 123 | 2472-2490 | Memorandum Opinion and Order (Nov. 7, 2022) |
| 125 | 2497-2502 | Plaintiffs' Amended Joint Notice of Appeal (Nov. 11, 2022) |