No. 22-6014
No. 23-5439

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

AMERICAN RELIABLE INSURANCE COMPANY, et al.,

*Plaintiffs-Appellants /*
*Cross-Appellee*

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee /*
*Cross-Appellant*

On Appeal from the United States District Court
For the Eastern District of Tennessee

---

## CONSOLIDATED RESPONSE AND REPLY BRIEF OF PLAINTIFFS

---

Mark S. Grotefeld
**GROTEFELD HOFFMANN LLP**
6034 West Courtyard Drive, Suite 200
Austin, Texas 78730
737.226.5600

Jonathan J. Tofilon
**GROTEFELD HOFFMANN LLP**
407 S. Third Street, Suite 200
Geneva, Illinois 60134
630.262.1112

Matthew J. Evans
**KAY GRIFFIN EVANS, PLLC**
900 S. Gay Street, Suite 1810
Knoxville, Tennessee 37902
865.314.8422

Evan B. Stephenson
**SPENCER FANE LLP**
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
303.839.3800

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................4

CITATION FORMS ...........................................................................8

SUPPLEMENTAL STATEMENT OF ISSUES .....................................9

SUPPLEMENTAL STATEMENT OF THE CASE ...............................10

    A.    The Government Violated the Safety Plan's Mandate to Warn the Public ......................................................................................10

ARGUMENT ...................................................................................13

I.    THE DISTRICT COURT ERRED IN APPLYING THE FIRST PRONG OF THE DISCRETIONARY FUNCTION EXCEPTION BECAUSE THE GOVERNMENT'S NEGLIGENCE VIOLATED NON-DISCRETIONARY SAFETY MANDATES WHICH THE GOVERNMENT ITSELF PUT IN PLACE .......................................................................................13

    A.    This Court Has Already Decided that Section 3.3.2 and Table 13 May Set Forth Mandatory Directives .........................................13

    B.    The Government Has Failed to Dispute That Its Fire Management Activities Were *Ultra Vires* and Not Subject to the Discretionary Function Exception ...........................................................15

    C.    The Government Improperly Disputes Plaintiffs' Proximate Cause Allegations..........................................................................19

    D.    The Government Fails to Dispute that It Has Admitted to Violations of Mandatory Policy in the NPS Report .................................23

    E.    The Motion Wrongly Argues Based on *Miller v. United States* that it Has Complete Discretion on "How to Fight the Fire" ......................23

F.   The Government Had No "Discretion" to Violate the Required Command Structure in Conducting its Fire Response .......................29

G.   The Government Had No "Discretion" to Discontinue Overnight Monitoring of the Chimney Tops 2 Fire in Violation of Its Own Fire Monitoring Plan..................................................................................33

H.   The Government Had No "Discretion" to Disregard the WFDSS System, the Decision Support System Required for Developing and Authorizing a Fire Management Response Plan for Every Wildland Fire.........................................................................................................37

II.   THE DISTRICT COURT ERRED IN APPLYING THE SECOND PRONG OF THE DISCRETIONARY FUNCTION EXCEPTION BECAUSE PLAINTIFFS' CLAIMS FOR THE VIOLATION OF MANDATORY FIRE SAFETY PROTOCOLS ARE NOT SUSCEPTIBLE TO A POLICY ANALYSIS...................................................................................................42

A.   The Government Fails to Appropriately Define the Conduct.............45

B.   Decisions Based Upon Safety Considerations Under Established Policy Are Not Susceptible to a Policy Analysis ...........................................46

C.   This Court Has Already Decided that Even If Section 3.3.2 and Table 13 Do Not Set Forth Mandatory Directives to Warn, the Government May Still Not Be Entitled to Immunity Under the Second Prong ......50

CONCLUSION .............................................................................................53

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS..........56

CERTIFICATE OF SERVICE ..............................................................................57

DESIGNATION OF RELEVANT DOCUMENTS ................................................62

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.O. Smith Corp. v. United States,*
 774 F.3d 359, 2014 WL 7181321 (6th Circ. 2014) ...............................*passim*

*Abbott v. United States*
 No. 22-5492, 2023 WL 5286966 (6th Cir. Aug. 17, 2023) .................*passim*

*American Reliable Ins. Co. v. United States*
 502 F.Supp.3d 1266 (E.D. Tenn. Nov. 24, 2020) ...................................9, 27

*Andrulonis v. United States,*
 952 F.2d 652 (2d Cir. 1991) .........................................................................47

*ARA Leisure Servs. v. United States*,
 831 F.2d 193 (9th Cir. 1987) ......................................................................45, 47

*Aslakson v. United States*,
 790 F.2d 688 (8th Cir. 1986) ......................................................................45, 47

*Berkovitz v. United States*,
 486 U.S. 531 (1988).......................................................................................47

*Brown v. United States*,
 547 F.Supp.2d 759 (W.D. Ky. 2008) ...........................................................47

*Buckler v. United States*,
 919 F.3d 1038 (8th Cir. 2019) ......................................................20, 26, 30

*Bultema v. United States*,
 359 F.3d 379 (6th Cir. 2004) ........................................................................27

*Burgess v. United States*,
 375 F.Supp.3d 796 (E.D. Mich. 2019) .........................................................47

*Caplan v. United States*,
 877 F.2d 1314 (6th Cir. 1989) ......................................................................35

*Carrier Corp. v. Outokumpu Oyj,*
    673 F.3d 430 (6th Cir. 2012) .........................................................................20

*Edwards v. Tennessee Valley Auth.,*
    255 F.3d 318 (6th Cir. 2001) ......................................................................28

*Fla. Dep't Agric. & Consumer Servs. V. United States,*
    4:09-CV-00386, 2010 WL 3469353 (N.D. Fla. Aug. 30, 2010).............23, 26

*Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.,*
    491 F.3d 320 (6th Cir. 2007) .........................................................................21

*Griffin v. United States,*
    500 F.2d 1059 (3d Cir. 1974) ........................................................................47

*Hajdusek v. United States,*
    895 F.3d 146, (1st Cir. 2018) ..................................................................47, 49

*Hale v. Ostrow,*
    166 S.W.3d 713 (Tenn. 2005) ......................................................................29

*Hardscrabble Ranch v. United States,*
    840 F.3d 1216 (10th Cir. 2016) .......................................................25, 28, 44

*In Re Katrina Canal Breaches Consol. Litig.,*
    696 F.3d 436 (5th Cir. 2012) ........................................................................47

*In re Ohio River Disaster Litig.,*
    862 F.2d 1237 (6th Cir.1988) ..................................................................36, 38

*In re Tennessee Valley Auth. Ash Spill Litig.,*
    787 F. Supp. 2d 703 (E.D. Tenn. 2011) ..................................................37, 38

*Kimball v. United States,*
    2014 WL 683702 (D. Idaho, Feb. 20, 2014) ................................................47

*Kisor v. Wilkie*,
 139 S. Ct. 2400 (2019) ........................................................30

*Knezovich v. United States*,
 __F. 4th __, 2023 WL 5988300 (10th Cir. Sept. 15, 2023 ...........................25

*Kohl v. United States*
 699 F.3d 935 (6th Cir. 2012) .......................................................25

*Mays v. Tennessee Valley Authority*,
 699 F.Supp.2d 991 (E.D. Tenn. 2010) ................................. *passim*

*Miller v. United States,*
 163 F.3d 591 (9th Cir. 1998) ...............................................*passim*

*Montez ex rel. Estate of Hearlson v. United States*,
 359 F.3d 392 (6th Cir. 2004) .......................................................28

*Myers v. United States*,
 17 F.3d 890 (6th Cir. 1994) .................................................*passim*

*Myslakowski v. United States*,
 806 F.2d 94, 98 (6th Cir. 1986) ....................................................27

*Red Lake Band of Chippewa Indiana v. United States*,
 800 F.2d 1187 (D.C. Cir.1986)......................................................18

*Rosebush v. United States*,
 119 F.3d 438 (6th Cir. 1997) .............................................. *passim*

*Safeco Ins. Co. v. United States*,
202 F.3d 279, 1999 WL 1038272 (9th Cir. 1999) ..................................21

*Sharp ex rel. Estate of Sharp v. United States*,
 401 F.3d 440 (6th Cir. 2005) ...............................................28, 52

*Stanford v. United States*,
 992 F. Supp.2d 764 (E.D. Ky. 2014).............................................18

*United States v. Gaubert*,
499 U.S. 315 (1991)............................................................................... 22, 23

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*
467 U.S. 797 (1984) ..................................................................... 18, 22, 46

*Whisnant v. United States*,
400 F.3d 1177 (9th Cir. 2005) .........................................................47

## Statutes

28 U.S.C. §2680 ........................................................................................18

## CITATION FORMS

| | |
|---|---|
| Am. Reliable RE# | Record Entry Number from Am. Reliable Ins. V. US, District Court Docket No. 3:19-cv-469 |
| State Farm RE# | Record Entry Number from State Farm v. US, District Court Docket No. 3:19-cv-470 |
| USAA RE# | Record Entry Number from United Services Auto Ass'n v. US, District Court Docket No. 3:19-cv-472 |
| Allstate RE# | Record Entry Number from Allstate v. US, District Court Docket No. 3:19-cv-474 |
| Auto-Owners RE# | Record Entry Number from Auto-Owners v. US, District Court Docket No. 3:19-cv-478 |

## <u>SUPPLEMENTAL STATEMENT OF ISSUES</u>

1.      Whether the discretionary function exception to the Federal Tort Claims Act bars Plaintiffs' Fire Management claims against the Defendant. *See* <u>American Reliable Ins. Co. v. United States</u>, 502 F. Supp. 3d 1266 (E.D. Tenn. November 24, 2020).

2.      Whether the discretionary function exception to the Federal Tort Claims Act bars Plaintiffs' Failure to Warn claims against the Defendant. *See* <u>American Reliable Ins. Co. v. United States</u>, 502 F. Supp. 3d 1266 (E.D. Tenn. November 24, 2020).

## SUPPLEMENTAL STATEMENT OF THE CASE

### A.    The Government Violated the Safety Plan's Mandate to Warn the Public

The Safety Plan specifically requires that "Park neighbors, Park visitors, and local residents **will be** notified of **all** planned **and** unplanned fire management activities that have the potential to impact them."[1] In Section 4.4.2(F), the Safety Plan states: "This section outline[s] mitigation actions **required** . . . to ensure the safety of . . . the neighboring public."[2] Table 13 from that section, entitled, "Mitigations for Public Safety Issues," lists certain "Public Safety Issues," accompanied by the "Mitigation" actions required for each.[3] As to "Park Neighbors," Table 13 lists three required warning actions: (i) "Post current fire information on websites as available"; (ii) "Inform park neighbors of wildland fires"; and (iii) "Use information officer and/or park public affairs to disseminate information."[4] None of these are discretionary.

In violation of the Safety Plan, the Park did not warn Gatlinburg of the Fire.[5]

---

[1] Great Smoky Mountains National Park Fire Management Plan ("Park Plan"), Auto-Owners RE# 32-6, § 3.3.2(C), PAGE ID# 2588 (emphasis added).

[2] *Id.* at PAGE ID ID# 2615 (emphasis added).

[3] *Id.*

[4] *Id.*

[5] Amended Complaint for Damages Under the Federal Tort Claims Act, Auto-Owners RE# 32 ¶¶ 82, 94–95, 111, 118, 254, PAGE ID # 1926.

10

Instead, the arrival of smoke and ash in the City on the morning of November 28, 2016, prompted the Gatlinburg Fire Department to call the Park's Fire Management Officer. The Fire Management Officer did not pick up.[6] He returned the call two hours later, at 10:58 a.m.[7] The Gatlinburg Fire Department is a highly-qualified department with significant wildfire training and experience, and it provided the Park with free services averaging 150 responses per year.[8] Instead of warning Gatlinburg as required by the Safety Plan, the Fire Management Officer did the opposite: he told the Gatlinburg Fire Department that the Park did not need help with the Fire, and that the Fire was not a threat to the City.[9] Within 45 minutes of that call, the Fire Management Officer called to ask the Gatlinburg Fire Department to assist.[10] He was far too late. Around noon, City officials realized the Fire was "coming out of the Park" and into the City.[11]

The failure to warn the public of the Fire had catastrophic consequences.

---

[6] *Id.* at ¶ 119; ABS After Action Review of the November 29, 2016, Firestorm ("ABS Report"), Auto-Owners RE 32-10, at PAGE ID# 3543.

[7] Am. Compl., RE 32, ¶¶ 119–21, 255, PAGE ID# 1951, 1977; ABS Report, RE 32-10, PAGE ID# 3543-45.

[8] Am. Compl., RE 32, ¶¶ 92–93, 258, PAGE ID# 1945-46, 1978; ABS Report, RE 32-10, PAGE ID# 3547-49, 3590.

[9] Am. Compl., RE 32, ¶¶ 121, 125, 256, PAGE ID# 1951-52, 1978; ABS Report, RE 32-10, PAGE ID# 3544.

[10] Am. Compl., RE 32, ¶¶ 92–93, 119–25, 256, PAGE ID# 1945-46, 1951-52, 1978.

[11] *Id.* at ¶ 127, PAGE ID# 1952-53.

11

Evacuations were obstructed by fire, downed trees, and power lines blocking roads.[12] But more importantly, warning the Gatlinburg Fire Department timely would likely have prevented the catastrophe from happening at all, since that fire department had the capability to suppress the fire and even had an agreement with the Park to perform precisely that function when requested.[13]

Plaintiffs have not alleged that these requirements were performed incorrectly, but rather, Plaintiffs have alleged that the Government took ***no action*** to warn local officials or residents of the potential danger to the community until it was too late, despite a mandatory obligation to do so. The failure to warn is alleged to have caused Plaintiffs' damages.[14]

---

[12] *Id.* at ¶ 262, PAGE ID# 1979.
[13] *Id.* at ¶¶ 92–95, 257–59, PAGE ID# 1945-46, 1978-79.
[14] *Id.* at ¶¶ 166–68, 263–69, PAGE ID# 1960, 1980.

## **ARGUMENT**

I.    **THE DISTRICT COURT ERRED IN APPLYING THE FIRST PRONG OF THE DISCRETIONARY FUNCTION EXCEPTION BECAUSE THE GOVERNMENT'S NEGLIGENCE VIOLATED NON-DISCRETIONARY SAFETY MANDATES WHICH THE GOVERNMENT ITSELF PUT IN PLACE**

### A.    **This Court Has Already Decided that Section 3.3.2 and Table 13 May Set Forth Mandatory Directives**

In *Abbott v. United States*, 78 F.4th 887 (6th Cir. 2023), a panel of this Court held that both § 3.3.2 and Table 13 of the Fire Management Plan should be considered on remand under the first prong of the discretionary function analysis. *Id.* at 901-03. The Government's arguments to the contrary, which it also made in *Abbott*, are precluded by the *Abbott* decision and are therefore unavailing. *See Wallace v. FedEx Corp.*, 764 F.3d 571, 583 (6th Cir. 2014) ("In the regular course of events, one panel of this court cannot overrule another panel's published decision." (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001)); 6 Cir. R. 32.1(b) ("Published panel opinions are binding on later panels.").

Specifically, the Government argues in its response brief that neither § 3.3.2 nor Table 13 contain a "specific directive" that "divest[ed] Park Service employees of all meaningful discretion."[15] But the *Abbott* court considered this argument and

---

[15] Principal and Response Brief for United States of America, ECF 94, pp. 15, 26-27, 38.

soundly rejected it. The *Abbott* court first explained that § 3.3.2 "*requires* Park officials to determine whether" fire management activities could impact neighbors, visitors, and local residents. *Abbott*, 78 F.4th at 901. Thus, "[i]f Park officials failed to conduct that assessment, they are not shielded by the discretionary-function exception." *Id.* (citing *Myers*, 17 F.3d at 895). Then, second, if Park officials conduct the required assessment and determine that fire management activities have the potential to impact neighbors, visitors, and local residents, "then Section 3.3.2 became mandatory." *Id.* Stated differently, the *only* way that Park officials could be "shielded by the discretionary-function exception as it relates to Section 3.3.2" is "if they conducted the required antecedent assessment and determined that the fire management activities did not have the potential to impact Park visitors, Park neighbors, or local residents." *Id.*

The directives in Table 13 are similarly mandatory, as they contain "mitigation actions *required* to protect values at risk and to ensure the safety of park staff and visitors as well as the neighboring public." *Abbott*, 78 F.4th at 901. One such required mitigation action is that Park officials "[i]nform park neighbors of wildland fires." *Id.* at 902. The Government argued in *Abbott*, as it does here, that such a directive "does not provide guidance on how to accomplish that objective and

therefore leaves Park officials with discretion in its implementation."[16] *Id.* But just as in *Abbott*, the complaint here "does not concern how the Park provided notice of the Fire, but rather that it failed to provide *any* notice." *Abbott*, 78 F.4th at 902. The Government's attempt to argue that the lack of specificity as to the *manner* of notice means that no notice was required whatsoever, even despite the clear language of Table 13, should (and must) be rejected under *Abbott*. *Id.*

Given the prior binding panel opinion in *Abbott*, this Court should likewise reverse the district court's dismissal of the failure to warn claims based on the first prong of the test and remand for reconsideration.

### B.    The Government Has Failed to Dispute That Its Fire Management Activities Were *Ultra Vires* and Not Subject to the Discretionary Function Exception

The Government has simply failed to respond to Plaintiffs' argument that its fire management activities were *ultra vires*, and therefore, not subject to the discretionary function exception.[17] In their opening brief, Plaintiffs describe how Mr. Salansky was specifically prohibited by Park rules from simultaneously performing the roles and responsibilities of a Fire Management Officer, Incident Commander, and a Duty Officer.[18] Plaintiffs also explained that the FMO or FDO

---

[16] Principal and Response Brief for United States of America, ECF 94, pp. 47-52.

[17] Consolidated Initial Brief of Plaintiffs-Appellants, ECF 88-1, § II.C.

[18] *Id.* at pp. 15-20.

15

was required to utilize the WFDSS in every fire and to submit the resulting fire management plan to a Fire Management Committee and the Park Superintendent for final approval and a Delegation of Authority.[19] Thus, Plaintiffs allegations remain uncontested: throughout the response to the Chimney Tops 2 Fire, Mr. Salansky was never authorized by Park rules to make the fire management decisions he made, and Mr. Salansky was expressly prohibited from performing the roles and responsibilities he performed. In short, Mr. Salansky did not have any discretion to perform his fire management actions because he was operating entirely *ultra vires*.

Although the present appeal involves only a 12(b)(1) "facial attack," the Government has previously admitted both that Mr. Salansky lacked the requisite authority to perform his fire management actions and that he was prohibited from assuming all three leadership roles during a wildfire. The NPS Report specifically acknowledges that the WFDSS plan was required for every fire and that all fire response plans, including decisions to attempt to manage a wildfire, had to be approved by the fire management committee and the superintendent.[20] The NPS Report explains that Park rules required WFDSS approval in order for the necessary Delegation of Authority to authorize the Incident Commander's fire management

---

[19] *Id.* at pp. 20-25.
[20] NPS Report, RE# 32-9, PAGE ID# 3434-3435.

actions.[21] The Government also admits in the NPS Report that Park rules prohibited Mr. Salansky from simultaneously assuming all three leadership roles during a wildfire.[22] Moreover, in a related action involving a 12(b)(1) "factual attack" this Court has previously found that Salansky violated official park policies by assuming all three key leadership roles during the Chimney Tops 2 fire:

> The NPS report explained that Salansky, in violation of official policy, acted as the Fire Management Officer (the person responsible for leading the wildland fire program), the Incident Commander (the person responsible for managing the Fire), and the Duty Officer (the person responsible for ensuring compliance with safety policies and keeping information officers informed of the current and expected situation).

*Abbott v. United States*, No. 22-5492, 2023 WL 5286966, at *6 (6th Cir. Aug. 17, 2023). Thus, there can be no dispute, particularly at this early stage, that Plaintiffs' allegations are true, Mr. Salansky did not possess the authority to perform his actions during the Chimney Tops 2 fire.

Without the requisite authority, Mr. Salansky's conduct cannot possibly be immunized as "a discretionary function or duty on the part of a federal agency or an

---

[21] *Id.*
[22] *Id.* at PAGE ID## 3428-3430, 3433, 3450, 3467.

employee of the Government." 28 U.S.C.A. § 2680 (West). As explained by the D.C. Circuit:

> [A] decision cannot be shielded from liability if the decisionmaker is acting without actual authority. A government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers. An employee of the government acting beyond his authority is not exercising the sort of discretion the discretionary function exception was enacted to protect. This proposition is implied in *Varig* and *Dalehite*, and has been uniformly followed.

*Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1196 (D.C. Cir. 1986); *Stanford v. United States*, 992 F. Supp. 2d 764, 776 (E.D. Ky. 2014) (same). Accordingly, Plaintiffs' allegations related to the negligence of Mr. Salansky are not immunized by the discretionary function exception because Mr. Salansky was operating *ultra vires.*

Rather than disputing Mr. Salansky's authority directly, the Government seems to pivot to a "proximate cause" argument, essentially arguing that Plaintiffs are quibbling, and that the rules governing authority and command structure in fire management are superfluous and inconsequential, and thus, cannot possibly be considered a proximate cause of this fire. For the reasons stated next, the Government's "proximate cause" argument is premature and must be rejected.

**C.     The Government Improperly Disputes Plaintiffs' Proximate Cause Allegations**

The Government has improperly utilized a 12(b)(1) "facial attack" to argue that the policy violations at issue were not the proximate cause of Plaintiffs' damages. The Government's proximate cause argument appears in two repeating themes: (1) the NPS report concluded that Salansky's policy violations would not have prevented the outcome,[23] and (2) vague allusions to other unspecified discretionary firefighting activity as responsible for Plaintiffs' damages.[24] Because each of the Government's arguments go to causation, they are improper at this stage and not relevant to the jurisdictional question on appeal.

First, the Government improperly relies upon a legal conclusion contained within the NPS Report that certain violations of NPS policy "would likely have not led to a different outcome on the Chimney Tops 2 Fire."[25]  At the pleading stage, however, the Government cannot rely upon the NPS Report to negate Plaintiffs well pled allegations of proximate cause. While the NPS Report is an exhibit to Plaintiffs' Complaints, Plaintiffs are not bound by *legal conclusions* contained within the NPS

---

[23] Principal and Response Brief for United States of America, ECF, 94, pp. 15, 26-27, 38.
[24] *Id.* at pp. 40, 42-43, 45, 48-49.
[25] *Id.* at pp. 15, 26-27, 38.

Report, but only the *facts* which Plaintiffs have relied upon in their pleading.[26]

Moreover, the Government overlooks that the conclusion they cite addresses only

one of the policy violations at issue in this litigation (Salansky's assumption of three

leadership roles),[27] and this conclusion is contradicted by the very next section of

the report which identifies the inadequate training of the Park's leadership as a

fundamental deficiency which, if corrected, likely would have resulted in a different

outcome.[28] Therefore, even the Government's conclusions as to proximate cause

within the NPS Report are, at best, contradictory.

Second, the Government repeatedly denies Plaintiffs' proximate cause

allegations by arguing that other ***unspecified*** firefighting decisions caused Plaintiffs

damages. In essence, the Government invites the Court to consider the

Government's entire fire management response and conclude that fire management

decisions unrelated to Plaintiffs' allegations must be considered a supervening cause

---

[26] *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 442 (6th Cir. 2012) (finding that plaintiff was free to draw supportive facts from an agency report in its complaint and that defendant was prohibited from questioning the evidentiary foundation in a 12(b)(1) facial attack); *but see Buckler v. United States*, 919 F.3d 1038, 1047, n. 2. (8th Cir. 2019) (recognizing a limited deference to an agency interpretation of the agency's own regulation within the context of the discretionary function exception).
[27] NPS Report, RE# 32-9, PAGE ID# 3454-3456 ("Finding 9 - During the fire, the FMO was simultaneously serving as the duty officer and incident commander, which is contrary to NPS policy.").
[28] *Id.* at PAGE ID# 3456-3457.

of Plaintiffs' damages. The Government's argument is clearly premature, however, as it constitutes an attack on the merits of Plaintiffs claim.[29] Under state tort law, the Government's proximate cause arguments ordinarily present questions for the trier of fact.[30] Accordingly, the ultimate question of whether discretionary conduct, non-discretionary conduct, or some combination of both ***proximately caused*** the Plaintiffs' damages must remain exclusively within the province of the trier of fact.[31]

Further, the Government's proximate cause arguments violate the standard of review in a 12(b)(1) facial challenge under the first prong of the discretionary function test because it is only the challenged conduct—not the ultimate result of the

---

[29] *Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) ("If, on the other hand, an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the district court should "find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's claim."); *see also Safeco Ins. Co. v. United States*, 202 F.3d 279, 1999 WL 1038272 (9th Cir. 1999) (unpublished table opinion) (denying application of discretionary function exception where Plaintiff alleged the Forest Service breached a mandatory duty to monitor on the day of the fire, and holding that the Forest Services' claimed discretion regarding *when* to monitor or *how to respond* to information obtained while monitoring were proximate cause questions irrelevant to the 12(b)(1) jurisdictional question).

[30] *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005) ("Cause in fact and proximate cause are "ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome.")

[31] *See* TENN. PATTERN INSTR.-CIVIL 3.21 ("It is not necessary that a defendant's act be the sole cause of a plaintiff's injury, only that it be ***a*** cause.") (emphasis added); TENN. PATTERN INSTR.-CIVIL 3.24 ("The superseding cause must not have been brought about by the original negligence").

challenged conduct—which must be reviewed by the Court. As explained by the *Mays* Court:

> For purposes of the first part of the Gaubert test, ***it is not the ultimate result*** of the challenged conduct and whether that result violated a specific statute, regulation or policy, ***but whether there was a violation of a specific, mandatory directive in the conduct leading up to the ultimate result***. At this stage of the inquiry, the issue of whether the challenged conduct was negligent is irrelevant.

*Mays v. Tennessee Valley Auth.*, 699 F. Supp. 2d 991, 1011, 2010 WL 1233966 (E.D. Tenn. 2010) (citing *Varig Airlines*, 467 U.S. 797 (1984)). Therefore, the Government invites this Court to error by considering the ultimate results of all the Government's fire management activities. Although numerous discretionary choices were made in the days leading up to the fire entering the City of Gatlinburg unannounced, these considerations are outside the scope of this Court's Review. A 12(b)(1) facial attack must focus its consideration on the specific, mandatory directives allegedly violated which led to the ultimate result.[32] The question of whether Plaintiffs can ultimately prove proximate cause is a separate question, and ultimately, a question for the trier of fact.

## D. The Government Fails to Dispute that It Has Admitted to Violations of Mandatory Policy in the NPS Report

---

[32] *Id.*

The Government has failed to dispute that the NPS Report contains the official findings of the National Park Service, and that the Report **admits** to multiple violations of required fire safety policy.[33] As such, *Fla. Dept. of Agric. & Consumer Servs.* is directly on point.[34] Because the Government has admitted that it failed to follow its own plan in its official after-action report, the Government's 12(b)(1) "facial attack" fails to meet the first prong of the *Gaubert* test and must be rejected.

### E.    The Motion Wrongly Argues Based on *Miller* v. *United States* That It Has Complete Discretion On "How to Fight the Fire"

Throughout its brief, the Government argues that because it retained some degree of discretion as to the broader goal of "fighting the fire," no individual act relating to the Government's fire management can be considered mandatory under the discretionary function exception.[35] The Government arrives at this mistaken conclusion by over-reading a single line from *Miller v. United States.* 163 F.3d 591 (9th Cir. 1998). According to *Miller*, "[t]he existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." *Id.* at 595. However, the

---

[33] Consolidated Initial Brief of Plaintiff-Appellants, ECF 88-1, PAGE ID# 48-57.

[34] *State of Florida Dep't of Agric. & Consumer Servs. v. United States*, No. 4:09-CV-386/RS-MD, 2010 WL 3469353 (N.D. Fla. Aug. 30, 2010).

[35] Principal and Response Brief for United States of America, ECF 94 at 40, 42-43, 45, 48-49.

Government's overbroad reading of *Miller* is undermined by *Miller* itself and contrary to Sixth Circuit precedent.

First and foremost, the *Miller* Court analyzed the government policy language at issue, not by determining whether the "broader goals" of the policy involved discretion, but by analyzing whether the policies themselves were mandatory as written. The *Miller* Court found that the policies at issue were discretionary, even though phrased as mandatory, because they contained an express exception for the "multiple fire" scenario.[36]According to the manual in question, the "multiple fire" scenario required that responders exercise their discretion consistent with broader Forest Service goals, rather than following normal operating procedure.

The *Miller's* Court's opinion does not counsel courts to abandon the task of interpreting policy language whenever a broader goal is present, as the Government urges. If that were the case, all policies would be discretionary.[37] Rather, *Miller*

---

[36] The analysis in *Miller* and other cases is also inapposite here because the Forest Service is a separate agency from the Park Service, with its own fire regulatory scheme implemented through its own distinct internal agency documents. *See, e.g.*, *Miller*, 163 F.3d at 594–96 (discussing four Forest Service-specific documents).

[37] The Government's exposition of *Miller* is precisely the kind of overbroad definition of conduct that the Sixth Circuit has rejected as "too extreme" because it is "a contention that every decision, at every level, in the context of the [conduct] would be shielded from liability." *Kohl*, 699 F.3d at 941; accord *Myers*, 17 F.3d at 897 ("sweeping application" of the discretionary-function exception rejected); *Mays v. Tenn. Valley Auth.*, 699 F. Supp. 2d 991, 1019 (E.D. Tenn. 2010) (the discretionary-function exception not to "swallow the rule").

stands for the well-worn principle that the Court must consider the entire manual ***in***

***context*** when determining whether a policy is discretionary. If the manual provides

an exception to mandatory policies to ensure broader goals are met, the language

and intent of the manual will be upheld. The cases after *Miller* which repeat the

"broader goals" language, follow this same pattern.[38] These courts do not use the

"broad goals" of a policy to negate mandatory policy language, but rather, these

courts first interpret the policies as written to determine whether application of the

policy involved discretion under the facts presented.

　　　The facts in *Miller* and *Hardscrabble* are a far cry from the subject case,

where the Government itself has admitted in the NPS Report that numerous of its

policies were applicable and were violated.  The present scenario is far more similar

to the admission of fire management policy violations in *State of Florida Dep't of*

*Agric. & Consumer Servs. v. United States*.[39] This is not a case where Park Officials

simply abused their allotted discretion in fighting fires on federal land. In this case,

the Government has admitted in the NPS Report that the Park failed to follow

---

[38] *Knezovich v. United States*, __F. 4th __, 2023 WL 5988300 (10th Cir. Sept. 15, 2023); *Hardscrabble Ranch v. United States*, 840 F.3d 1216, 1221 (10th Cir. 2016).
[39] No. 4:09-CV-386/RS-MD, 2010 WL 3469353, at *4 (N.D. Fla. Aug. 30, 2010) ("Defendant's admissions demonstrate a clear disobedience to mandates that are not discretionary. While Defendant may have had discretion as to the analysis conducted within the Burn Plan, Defendant had no judgment or choice whether to complete a Plan and then follow it once approved.").

mandatory fire management procedures.

The Government's overbroad reading of *Miller* is also contradicted by Sixth Circuit precedent. The Government stretches the holding in *Miller* to mean that a breach of mandatory fire management policy can be immunized *post hac* by subsequent discretionary acts in implementing a fire management plan, however, that is not the law in the Sixth Circuit. In *A.O. Smith*, the Sixth Circuit rejected such a rule, stating that the Government protocols "may fail to specify *how* and *when* they are to be implemented, but the protocols may nonetheless be nondiscretionary as to *whether* they are to be implemented."[40] Similarly, the Sixth Circuit recently held in *Abbott*, that although the Government could rightfully exercise discretion in determining whether its fire management activities might affect park neighbors, it did not have discretion to decline to make the determination at all.[41]

Contrary to the Government's (mis)interpretation of *Miller*, the "failure to

---

[40] *A.O. Smith Corp. v. United States*, 774 F.3d 359, 367, 2014 WL 7181321 (6th Cir. 2014) (emphasis in original); *see also Buckler v. United States,* 919 F.3d 1038, 1054 (8th Cir. 2019) ("Although the inspector possessed discretion as to the manner in which he reviewed documentation, and although it does not matter for purposes of the discretionary-function exception if the inspector acted negligently and sloppily in his investigation, he was wholly without discretion to not conduct at least some review of training materials.").

[41] *Abbott v. United States*, No. 22-5492, 2023 WL 5286966, at *8 (6th Cir. Aug. 17, 2023); *American Reliable Ins. Co. v. United States*, 502 F. Supp. 3d 1266 (E.D. Tenn. November 24, 2020).

warn" opinions of both *American Reliable* and *Abbott* teach that the discretionary aspects of the Park's fire regulatory scheme do not nullify the Park's specific requirements. *American Reliable* and *Abbott* are consistent with Sixth Circuit precedent which generally holds that a specific act performed within the context of a broader discretionary program is not deemed discretionary just because the specific act occurred in that context. To be discretionary for that reason, the specific act must be "the deliberate or necessary result" of the broader program. *Bultema v. United States*, 359 F.3d 379, 383 (6th Cir. 2004); *see, e.g.*, *Myslakowski v. United States*, 806 F.2d 94, 98 (6th Cir. 1986) (government not required to warn of latent defect in used vehicles expressly sold "as is" through a discretionary program, because specific warnings were necessarily excluded by the broader conduct in selling the vehicles "as is").

In addition to *Miller*, the Government relies upon several other inapplicable cases that fall into two general categories, both of which place them firmly within the discretionary function exception and clearly distinguish them from this case. First, the Government cites cases where the Court simply finds that the government policies at issue were not phrased as mandatory or were inapplicable. *Montez ex rel. Estate of Hearlson v. United States*, 359 F.3d 392, 394 (6th Cir. 2004); *Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 441 (6th Cir. 2005); *Edwards v.*

*Tennessee Valley Auth.*, 255 F.3d 318 (6th Cir. 2001); *Miller v. United States*, 163 F.3d 591 (9th Cir. 1998). While the Government makes much of the language and dicta used in these cases, because these cases did not involve mandatory policies violated by the Government, they have absolutely no application here.

Second, several of the Government's cases involve mandatory safety language which creates a general policy goal, but which does not mandate any specific actions the Government must take to achieve that goal. *See A.O. Smith Corp. v. United States*, 774 F.3d 359 (6th Cir. 2014); *Rosebush v. United States*, 119 F.3d 438 (6th Cir. 1997); *Hardscrabble Ranch v. United States*, 840 F.3d 1216, 1221 (10th Cir. 2016). *Rosebush* illustrates this point by explaining that, although the Forest Service was required to "immediately correct high-priority hazards that develop," none of the policies at issue specified what was a "high-priority hazard." In other words, none of the policies mandated that the "Forest Service maintain its campsites and fire pits in any *specific* manner." Unlike *Rosebush*, the Plaintiffs have identified multiple NPS rules which required the NPS to take very specific actions during their response to the Chimney Tops 2 fire, as further explained in the sections which follow.

**F.    The Government Had No "Discretion" to Violate the Required Command Structure in Conducting its Fire Response**

28

The Government's argument that there was no mandatory command structure must be rejected because it is contradicted by five different authoritative sources: (1) the Sixth Circuit's prior findings in *Abbott*, (2) the NPS Report's interpretation of official park policy, (3) the plain language of the Redbook, (4) the plain language of RM-18 and (5) the plain language of the Park Plan.

First and foremost, in a related action involving a 12(b)(1) "factual attack" this Court has previously found that Salansky violated official NPS policies by assuming all three key leadership roles during the Chimney Tops 2 fire:

> The NPS report explained that Salansky, in violation of official policy, acted as the Fire Management Officer (the person responsible for leading the wildland fire program), the Incident Commander (the person responsible for managing the Fire), and the Duty Officer (the person responsible for ensuring compliance with safety policies and keeping information officers informed of the current and expected situation).

*Abbott v. United States*, No. 22-5492, 2023 WL 5286966, at *6 (6th Cir. Aug. 17, 2023).

Second, as explained in Plaintiffs' opening brief, the NPS Report repeatedly observes that Mr. Salansky violated official Park policy by assuming all three command roles.[42] In response, the Government argues that the NPS Report was not undertaken to make "legal conclusions" as to whether Salansky transgressed specific

---

[42] Consolidated Initial Brief of Plaintiff-Appellants, ECF 88-1, PAGE ID# 15-20.

limits on his authority.[43] The Government overlooks relevant authority, however, which holds that the official findings and interpretations of an administrative agency as to whether its own policies have been violated is relevant to the "legal conclusion" at the heart of the discretionary function exception.[44] Further, the Government fails to recognize that the NPS Report was, in fact, expressly commissioned to investigate "*[t]he park's adherence to NPS fire management policy*."[45]

Third, the Government is wrong about the Redbook's authority within the NPS and within the Great Smoky Mountains National Park. As previously explained, both DO-18 and the Park Plan expressly required compliance with the Redbook.[46] In response, the Government argues that the Redbook states that it does not give "absolute rules" but requires "judgment in application."[47] The Redbook

---

[43] Principal and Response Brief for United States of America, ECF 94, PAGE ID# 45. The Government's position is entirely inconsistent with its repeated reliance on the NPS Report's legal conclusions relative to proximate cause.

[44] *Buckler v. United States*, 919 F.3d 1038, 1047, FN 2. (8th Cir. 2019) (recognizing a limited deference to an agency interpretation of the agency's own regulation within the context of the discretionary function exception); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2404 (2019) (upholding *Auer* deference to an agency's interpretation of its own rules).

[45] NPS Report, RE# 32-9, PAGE ID# 3404; Consolidated Initial Brief of Plaintiff-Appellants, ECF 88-1, PAGE ID# 51.

[46] Consolidated Initial Brief of Plaintiff-Appellants, ECF 88-1, FN 30, PAGE ID# 18; NPS Director's Order 18, Auto-Owners RE# 32-4; PAGE ID ## 2178-2187; Park Plan, RE# 32-6, PAGE ID# 2589, 2599.

[47] Principal and Response Brief for United States of America, ECF 94, PAGE ID# 44.

quote being cited by the Government has been ripped out of context, however, because this language is clearly not referring broadly to *all* Redbook policies. Rather, when read in context, this language is describing the general application of five broad fire management "principles:" (1) Objective (2) Speed and Focus, (3) Positioning, (4) Simplicity, and (5) Safety.  While such broad guiding "principles" exist in every agency of the Government, it is unreasonable to infer that the existence of broad flexible principles necessarily precludes specific requirements within the manual, particularly when such a reading is directly contradicted by the Redbook and the NPS Report's interpretation of the Redbook.

The Redbook itself states that it contains required policy for the National Park Service, and specifically, for employees engaged in fire management. According to the Redbook's stated purpose, it "states…or supplements policy…for…[the] National Park Service," and that, as an interagency policy document, it was mandatory for all employees engaged in fire management activities:  "[e]mployees engaged in fire suppression and fire management activities will comply with interagency […] fire management policy documents."[48] In Chapter 3 of the Redbook, which specifically addresses the National Park Service, it states "[t]his chapter summarizes *specific requirements* for NPS fire management programs," and

---

[48] Redbook, RE# 32-7, PAGE ID# 2652, and 2672.

states that in the case of any "discrepancy" between the Redbook, DO, or RM-18, the Redbook "*will be considered authoritative*."[49]

In response, the Government asserts another improper proximate cause argument, arguing that the NPS Report opines that remedying Salansky's command structure violations would likely have not led to a different outcome.[50] As stated above, the NPS Report's proximate cause conclusion is not "an interpretation of agency policy" and is therefore not entitled to any deference. The Park Rules identify clear divisions of responsibility, chains of command, and mandatory duties for each command role during a wildland fire event. As previously found by this Court in *Abbott*, these regulations prohibited Mr. Salansky from assuming multiple command roles, and contrary to the Government's position, the evidence will show that this policy was enacted with good reason. Setting aside premature questions of proximate cause, Plaintiffs' have alleged the violation of a non-discretionary policy: Mr. Salansky did not possess the authority or discretion to violate the Park's command structure policies during the Chimney Tops 2 fire.

### G.     The Government Had No "Discretion" to Discontinue Overnight Monitoring of the Chimney Tops 2 Fire in Violation of Its Own Fire Monitoring Plan

---

[49] *Id*. at PAGE ID# 2740.

[50] Principal and Response Brief for United States of America, ECF 94, PAGE ID# 46.

In analyzing the Park's fire monitoring policies, the Government's commits the same errors as the lower court: (1) it fails to take into account the interpretations of NPS policy contained within the NPS Report as to whether a policy was required, (2) it fails to recognize the interrelation of the NPS policy manuals at issue, and (3) it fails to recognize that the agency documents contain ***both*** requirements and recommendations.

First, the Government's argument appears internally inconsistent, acknowledging that the Government was required to adopt a fire monitoring schedule under RM-18,[51] but arguing in the next sentence that RM-18 contains ***mere*** guidance.[52] As Plaintiffs' have explained, the only coherent interpretation of RM-18 is that it contains both. It derives its authority from DO-18 which states that RM-18 is a "technical expression" of, in part, "***agency requirements***."[53] And while RM-18 acknowledges that it does contain some guidelines, the document states unequivocally that it also contains some requirements.

In its introduction, the RM-18 states "[t]he provisions of this reference manual ***supersede all previous NPS*** instructions, ***requirements***, and statements of policy relating to wildland fire management that may be in conflict," and shortly thereafter

---

[51] *Id.* at PAGE ID# 42.

[52] *Id.*

[53] DO-18, ¶ 4.1, RE# 32-4, PAGE ID# 2180.

states that "specific wildland fire program ***requirements are found in each chapter of RM-18***."[54] According to its plain language, therefore, RM-18 was intended to enact parkwide requirements, and is not ***merely*** "guidance."

Second, the Government's handling of the Fire Monitoring Handbook ("FMH") is misguided because it fails to comprehend the larger regulatory scheme which required the adoption of a monitoring schedule, and the Park's express adoption of the FMH monitoring schedule. The Government has acknowledged that RM-18 required the parks to adopt a monitoring schedule.[55] While RM-18 does not require the adoption of any specific schedule, any park which deviated from the FMH's "model" monitoring schedule was required to secure approval for doing so.[56] The FMH, therefore, provided the parks with a pre-approved monitoring schedule for wholesale adoption to fulfill the RM-18 requirement. Therefore, while the Government emphasizes that parks were not required to adopt the FMH monitoring schedule, the Government is technically correct. The point is irrelevant, however, because the parks were still required by RM-18 to adopt **a** wildfire monitoring schedule, and the Great Smoky Mountains National Park expressly adopted the

---

[54] RM-18, RE# 32-5, PAGE ID# 2197.
[55] Principal and Response Brief for United States of America, ECF 94, PAGE ID# 42.
[56] RM-18, RE# 32-5, PAGE ID## 2361-2362.

34

FMH's monitoring schedule to fulfill their RM-18 requirement.[57] Sixth Circuit precedent holds that once the Park exercised its discretion in adopting the FMH's model monitoring schedule, it was not free to disregard its requirements.[58] If the FMH's monitoring schedule was adopted by the Park, it contained numerous mandatory monitoring frequencies. If Plaintiffs allegations are true, and the Government failed to follow its monitoring frequency schedule for half of every day during the wildfire, the discretionary function exception cannot apply. The FMH monitoring schedule adopted by the Park required monitoring in increments of as little as 30 minutes for active wildfires.[59] There is no reasonable interpretation of the Park's monitoring schedule which would allow the Government to cease all monitoring for half of every day while the wildfire continues to rage and conditions continue to change.

In response, the Government misconstrued a statement from an unidentified employee who believed it was "standard protocol" not to staff the fire overnight.

---

[57] Park Plan, RE# 32-6, PAGE ID# 2618

[58] *A.O. Smith*, 774 F.3d at 367; *Abbott v. United States*, No. 22-5492, 2023 WL 5286966, at *13 (6th Cir. Aug. 17, 2023) (Clay Concurring) (citing *A.O. Smith*); *Mays v. Tennessee Valley Authority*, 699 F. Supp. 2d 991, 1021 (E.D. Tenn. 2010) (stating that once a relevant policy decision has been made, the government is accountable for negligence in the implementation of that decision), citing *Caplan v. U.S.*, 877 F.2d 1314, 1316 (6th Cir. 1989).

[59] FMH, RE# 32-8, PAGE ID# 3138.

From its context, however, the section of the NPS Report quoted was intended to highlight that park officials were ***improperly trained*** and thus did not understand the monitoring required under the Park's monitoring frequency schedule during an active wildland fire.[60] Indeed, the NPS Report concludes that improper training was likely responsible for the catastrophic outcome.[61] However, the failure of the Park Service to properly train their employees does not relieve them of liability under the discretionary function exception.[62] Once the monitoring plan was adopted, the plan's requirements were no longer discretionary, even if park leadership was unaware of the same.[63]

> **H.  The Government Had No "Discretion" to Disregard the WFDSS System, the Decision Support System Required for Developing and Authorizing a Fire Management Response Plan for Every Wildland Fire**

---

[60] NPS Report, RE # 32-9, PAGE ID# 3500

[61] *Id.* at PAGE ID# 3456-3457.

[62] *In re Ohio River Disaster Litig.*, 862 F.2d 1237, 1246 (6th Cir. 1988) (agreeing with the district court's finding that the Army Corps of Engineer's failure to conduct periodic inspections and failure to properly train personnel involved nondiscretionary conduct); *In re Tennessee Valley Auth. Ash Spill Litig.*, 787 F. Supp. 2d 703, 718 (E.D. Tenn. 2011) ([n]egligent failure to perform a policy decision—such as a failure to provide information and training to employees and/or inspectors for carrying out pre-determined policies and procedures[…]—would not involve the same policy judgments as the actual creation of those policies and procedures.").

[63] *Id.*

The Park was required to utilize the Wildland Fire Decision Support System ("WFDSS") for all fires within the Park, both to ensure minimum safeguards were implemented for each fire response plan, and as a formal procedure to vest authority in the Incident Commander to carry out the WFDSS plan. Plaintiffs have alleged, not that the WFDSS was used improperly or too infrequently, but that the WFDSS system was **never** utilized to formulate and approve Salansky's plan. This allegation is not merely Plaintiffs' interpretation of Park policy—it is the Government's own interpretation of applicable WFDSS policy as stated in the NPS Report.[64] In the NPS Report, the Government itself found that the reason the WFDSS system was not utilized had nothing to do with discretionary policy making or use of another decision support system—Park Officials simply **did not know** it was required:

> The park leadership was ***unaware*** of 2016 Redbook requirements that WFDSS be applied to all fires within park boundaries. The deputy superintendent stated that WFDSS was only used when a Type 1 incident management team was brought in. ***No one in the agency administrator role has training in WFDSS***.[65]

As explained above, a lack of training as to the required policy is not protected by the discretionary function exception.[66]

---

[64] NPS Report, RE# 32-9, PAGE ID# 3433.

[65] *Id.* at PAGE ID# 3435.

[66] *In re Ohio River Disaster Litig.*, 862 F.2d 1237, 1246 (6th Cir. 1988*); In re Tennessee Valley Auth. Ash Spill Litig.*, 787 F. Supp. 2d 703, 718 (E.D. Tenn. 2011).

In response, the Government argues that the Park Plan did not mandate use of one specific decision-support process, instead allowing an "equivalent" system to be utilized.[67] The Government points to a single parenthetical within the Park Plan to support this interpretation:

- "Wildfire Decision Support System (WFDSS, or equivalent) will be used on each wildland fire to document the decision making process and outline strategy and tactics employed."[68]

But the Government's interpretation contradicts its own experts' opinions in the NPS Report,[69] and it cannot withstand scrutiny under a comprehensive reading of the Park Plan.

The definition of "WFDSS" in the Park Plan states that WFDSS was *replacing* prior processes.[70] In confirmation, the Park Plan repeatedly names the WFDSS as the current required system:

- "Every wildfire will be assessed following a decision support process that examines the full range of responses. Wildland fire response strategies and tactics will consider firefighter and public health and safety, fire cause, current and predicted weather, current and potential fire behavior and effects, values to be protected,

---

[67] Principal and Response Brief for United States of America, ECF 94, PAGE ID# 39.

[68] Park Plan, RE# 32-6, Page ID# 2590.

[69] NPS Report, RE 32-9, PAGE ID# 3433-35.

[70] "This process is replacing the previously used WIFP and WFSA analysis processes." Park Plan, Definition of "WFDSS," RE# 32-6, PAGE ID# 2625.

> Documentation of the decision process will be accomplished using the WFDSS program."[71]

- "A strategic fire response[72] with supporting decision documentation will be initiated on each wildfire occurrence."[73]

- "Extended attack action requires a structured decision process (WFDSS) to guide the ongoing effectiveness and re-evaluation of suppression strategies."[74]

- "**Implementation Plan Requirements** Preparation of the WFDSS for extended attack and large fire suppression shall be completed to document suppression responses to wildfires that have exceeded initial attack response or exceeded management capability. The FMO or FDO shall be responsible for initiating the WFDSS process. The parks Fire Management Committee shall review WFDSS documents for recommendation to the agency administrator for approval."[75]

- "The following are duties of the FDO: […] Initiates WFDSS as required for each wildfire incident."

As described in Plaintiffs' Opening Brief, both the Redbook and RM-18 also clearly state that WFDSS plans were required for all fires within park boundaries,[76] and the Government makes no attempt to contradict these national NPS requirements.

---

[71] *Id.* at PAGE ID# 2584, 2588.

[72] A "strategic fire response" is a defined term in the Park Plan which expressly incorporates the use of the WFDSS system. *Id.* at PAGE ID# 2624.

[73] *Id.* at PAGE ID## 2584, 2588.

[74] *Id.* at PAGE ID# 2607.

[75] *Id.* (emphasis in original).

[76] Consolidated Initial Brief of Plaintiffs-Appellants, Doc. 88-1, Page ID## 21-22; *see* RM-18, RE 32-5, PAGE ID# 2215 ("Approval of the decision to manage a wildfire and the resulting course of actions to be taken to achieve management goals is the responsibility of the park superintendent and will be published in a decision support document.").

The Government argues further that other "decisional tools" were utilized by the Park during the fire response, such as the Near Term Fire Behavior system "NTFB." However, there is no basis in Plaintiffs' pleadings or the relevant manuals for this Court to conclude that these tools were "equivalent" to a published and approved decision in the WFDSS, particularly where, as here, the WFDSS system is the only tool identified as mandatory by these policy manuals. To the extent the Government claims that they engaged an "equivalent" process, this is, at best, a question of fact.[77] Moreover, the NPS Report makes clear that the results of the "NTFB run" were never shared with Park Leadership until the fire had left the park.[78] There is no possibility, therefore, that a fire management plan was created by an "NTFB run" and then authorized by the Fire Management Committee and approved by the Park Superintendent, as required by the Park Plan.[79]

---

[77] As explained in Appendix N of the Redbook, near term fire behavior (NTFB) models constitute only a single data point out of extensive array that must be incorporated into the WFDSS decision. Redbook, RE 32-7, PAGE ID# 3072, 3068-75.

[78] "When asked when this information was shared about the Near Term Fire Behavior run with the deputy park superintendent, the FMO/IC stated: 'Much later, maybe the 29th or 30th. I can't remember the exact date/time.'" NPS Report, RE# 32-9, PAGE ID# 3435.

[79] Park Plan, RE# 32-6, PAGE ID# 2607; NPS Report, RE# 32-9, PAGE ID# 3434.

The Government also argues that there is no requirement that the WFDSS be utilized "at any particular point in time."[80] This argument is a red herring, however, because Plaintiffs have alleged that the WFDSS system was **never** utilized to develop the Park's fire management plan. Therefore, any dispute on exactly "how" or "when" the WFDSS plan should have been utilized and implemented are not relevant to the discretionary function analysis.[81] Further, the Park Plan is very clear that the WFDSS must be utilized immediately "upon report of a possible wildfire."[82] Prior to initiating any "initial response" the Park Plan requires the Incident Commander to relay the size-up, planned strategy and tactics to the FMO/FDO, who must then "initiate the Wildland Fire Decision Support documentation process and notify the Fire Management Committee."[83] The Park Plan clearly required use of the WFDSS system **prior** to implementation of Salansky's containment plan. Both

---

[80] Principal and Response Brief for United States of America, ECF 94, PAGE ID# 40.

[81] *A.O. Smith Corp. v. United States*, 774 F.3d 359, 367, (6th Cir. 2014) (explaining that Government protocols "may fail to specify how and when they are to be implemented, but the protocols may nonetheless be nondiscretionary as to whether they are to be implemented."); *Abbott v. United States*, No. 22-5492, 2023 WL 5286966, at *8 (6th Cir. Aug. 17, 2023) (same); *State of Florida Dep't of Agric. & Consumer Servs.*, 2010 WL 3469353, at *4 (explaining that although the government "may have had discretion as to the analysis conducted within the Burn Plan, [it] had no judgment or choice whether to complete a Plan and then follow it once approved.").

[82] Park Plan, RE# 32-6, PAGE ID## 2604-2606.

[83] *Id.* at PAGE ID# 2605.

the NPS Report and Park Plan make clear that a published and approved WFDSS plan was required for the Delegation of Authority necessary to implement the plan.[84] The Park's approval requirements would have been entirely superfluous if it could be performed after the plan was implemented, the plan failed, and the Plaintiffs' suffered damage.

The Government also responds, once again, by improper proximate cause arguments. No discovery has taken place, and yet, the Government's argument is entirely fact based, arguing that its WFDSS system didn't contain any relevant parameters. Plaintiffs have alleged, and the manuals confirm, that the WFDSS process was designed to place *guardrails* around plan-development and the decision-making processes. As noted in the Redbook, the WFDSS system constrained fire management plans with various "Management Requirements" based upon NPS and Park fire policies which were "built-in" to the WFDSS the system and "automatically loaded" into every decision.[85] The WFDSS system further constrained the decision-making of Park officials with "minimum required

---

[84] *Id.* at PAGE ID# 2607; NPS Report, RE# 32-9, PAGE ID# 3434.

[85] Redbook, RE 32-7, PAGE ID# 3069. The Redbook also explains that "[a]pplicable fire-related [..] management requirements from the NPS Management Policies, as well as from a park's General Management Plan, Resource Management/Stewardship Plan, and Fire Management Plan (FMP), will be input into the WFDSS." Redbook, RE 32-7, PAGE ID# 2759.

documentation/data field entry for each fire,"[86] including *inter alia* "current and predicted weather" inputs,[87]" current and potential fire behavior and effects,"[88] and mandatory "Relative Risk Assessment" criteria which was to provide the Agency Administrator with a "comprehensive assessment of the risk of the fire."[89] In addition, all WFDSS plans also contain an "Incident Requirements" section which "state the limitations that the Agency Administrator imposes on fire managers associated with achieving the Incident Objectives in alignment with the overarching Strategic Objectives."[90] As Plaintiffs have alleged, the evidence in this case will show that because the Park failed to perform the minimum requirements necessary (monitoring, data collection, weather forecasting, fire modeling, risk analyses, etc.) to publish and secure approval for a WFDSS decision, prior to implementing Salansky's plan, Plaintiffs suffered damage.

Finally, the Government's reliance on *Hardscrabble* is unavailing here because both the facts and policies at issue in *Hardscrabble* are distinguishable.[91] First, *Hardscrabble* involved the United States Forest Service, a separate

---

[86] *Id.* at PAGE ID# 2758.
[87] Park Plan, RE 32-6, PAGE ID# 2587.
[88] *Id.*
[89] *Id.* at PAGE ID# 3072-73
[90] Redbook, RE 32-7, PAGE ID# 3070.
[91] *Hardscrabble Ranch v. United States*, 840 F.3d 1216 (10th Cir. 2016).

government entity, with its own unique policies relating to daily "*monitoring*" of fires using the WFDSS. Further, *Hardscrabble* was decided on a motion for summary judgment, where the Court analyzed the facts surrounding the Government's monitoring activities, finding that the USFS monitored the fire "sufficiently" under its monitoring policies.[92] In contrast, this Court can weigh only the *allegation* that the WFDSS was never utilized. Because this case involves only a facial challenge under 12(b)(1), it would be error for the Court to make the same factual findings of "compliance" with WFDSS policies as the Tenth Circuit did in *Hardscrabble*. Accordingly, the ruling of the District Court must be reversed.

## II.   THE DISTRICT COURT ERRED IN APPLYING THE SECOND PRONG OF THE DISCRETIONARY FUNCTION EXCEPTION BECAUSE PLAINTIFFS' CLAIMS FOR THE VIOLATION OF MANDATORY FIRE SAFETY PROTOCOLS ARE NOT SUSCEPTIBLE TO A POLICY ANALYSIS

The Government attempts to cover the Park Service's negligence by insisting every decision was susceptible to policy considerations. At bottom, the Government's argument rests solely on the indefensible claim that **all** fire safety activity is policy-based and involves a "balancing of considerations." But the failures Plaintiffs have identified are fire safety policies enacted pursuant to an established plan. They are not the sort of "policy"-laden discretionary acts that the exception

---

[92] *Id.* at 1222.

44

was meant to immunize; the actions are ordinary "garden-variety" negligence[93] far closer in resemblance to a driver who fails to keep their eyes on the road than anything remotely resembling a mistaken policy judgment.

### A.    The Government Fails to Appropriately Define the Conduct

Just as it did in the lower court, the Government's second-prong argument seeks to define its conduct overbroadly as "resource allocation" decisions grounded in *economic* policy, rather than *fire safety* policy. In its response, the Government defines the conduct at issue using sweeping generalizations, such as "Decisions regarding how to perform fire suppression operations" and "decisions regarding the allocation of fire suppression resources."[94] With these mischaracterizations, the Government improperly seeks to shift the focus of the discretionary function analysis away from Plaintiffs' specific allegations of fire safety policy violations toward the *consequences* and *ultimate results* of the Government's conduct.[95] The lower court correctly rebuked this overbroad approach as "dangerous," explaining:

---

[93] *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195-96 (9th Cir. 1987) (quoting *Aslakson v. United States*, 790 F.2d 688, 693-94 (8th Cir. 1986))

[94] Principal and Response Brief for United States of America, Doc. 94, Page ID# 50, 51.

[95] *Mays*, 699 F. Supp. 2d at 1011 (rejecting this approach) (citing *Varig Airlines*, 467 U.S. 797 (1984)).

"anything, if you step back far enough, is discretionary."[96] The District Court

correctly rejected the Government's overbroad caricature of the conduct at issue.[97]

### B.    Decisions Based Upon Safety Considerations Under Established Policy Are Not Susceptible to a Policy Analysis

The Government fails to address that the conduct at issue involves relatively

simple and straight-forward fire safety decisions, designed to protect lives and

property. The discretionary function exception does not apply "where the challenged

governmental activity involves *safety considerations under an established policy*

rather than the balancing of competing public policy considerations."[98] Neither does

it protect policies based upon objective scientific criteria, professional judgment, or

industry knowledge.[99] Moreover, a decision is not susceptible to policy analysis if

---

[96] *Am. Reliable Ins. Co.*, 502 F. Supp. 3d at 1275 (citing *Rosebush*, at 442); *see also Rosebush*, 119 F.3d at 445 (Merritt, J, dissenting) ("[i]f we are not careful in our application of the second prong of the test, the discretionary function exception to the Tort Claims Act could potentially swallow the entire Act.").

[97] *Am. Reliable Ins. Co. v. United States*, 502 F. Supp. 3d 1266, 1274–75 (E.D. Tenn. 2020) ("When analyzing an issue under the discretionary function exception, 'the crucial first step is to determine exactly what conduct is at issue.'") (citing *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997).

[98] *ARA Leisure Servs.*, 831 F.2d 193, 195 (9th Cir. 1987) (quoting *Aslakson*, 790 F.2d 688, 693 (8th Cir. 1986)); *see also Myers*, 17 F.3d at 898; *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) ("matters of scientific and professional judgment—particularly judgments concerning safety—are rarely considered to be susceptible to social, economic, or political policy.")

[99] *Berkovitz*, 486 U.S. at 544–45; *Myers*, 17 F.3d at 897; *In re Katrina Canal Breaches Consol. Litig.*, 696 F.3d at 451 n. 7 (technical advice based on electrical

the alleged balancing of competing interests creates a "patent[ly] unreasonable" result. *Hajdusek v. United States*, 895 F.3d 146, 152–53 (1st Cir. 2018). The balance struck must be legitimate. *Burgess*, 375 F. Supp. 3d at 816; *see also Brown v. United States*, 547 F. Supp. 2d 759, 764–65 (W.D. Ky. 2008) (government "inaction" in failing to replace a warning sign is not a permissible policy judgment). For example, in *Kimball v. United States*, 2014 WL 683702, at *8 (D. Idaho, Feb. 20, 2014), the court allowed a claim that the Forest Service had improperly erected fire-fighting equipment, because no public policy considerations legitimately justify failing to properly set up equipment to fight a fire.

Sixth Circuit precedent holds that when performing the second-prong analysis, "the inquiry must focus on an objective evaluation of the ***discretion conferred*** rather than a review of the actor's subjective method of choosing a course of action."[100]

These principles take every claim at issue outside the discretionary function

---

engineering principles is not susceptible to policy analysis); *Burgess v. United States*, 375 F. Supp. 3d 796, 814–15 (E.D. Mich. 2019) (Flint water case) (decisions based on professional and scientific judgment are not policy-based, and litigation-avoidance is not a permissible policy judgment); *Griffin v. United States*, 500 F.2d 1059 (3d Cir. 1974) (holding actionable the professional, scientific judgment exercised in approving live polio vaccine); *Andrulonis v. United States*, 952 F.2d 652, 655 (2d Cir. 1991) (holding actionable the medical judgment of a government doctor in failing to warn of hazards of research experiment);

[100] *Myers v. United States*, 17 F.3d 890, 896 (6th Cir. 1994).

47

exception. The Park's fire safety policies did not grant Salansky the discretion he exercised, and no policy-based justification exists for disposing of basic fire safety protocols and endangering public safety. For example, when the Redbook, RM-18, and the Park Plan all prohibit the same employee from assuming the positions of Incident Commander, Fire Management Officer, and Duty Officer during an active wildland fire, what does the Government believe could possibly be the purpose of such a prohibition? There is no other plausible explanation, except that it was not possible for a single individual to perform all command roles safely during an active wildland fire. There is no "political, social, or economic" policy[101] which gave Salansky the authority or discretion to seize control over the command structure throughout the entire event, and there is no policy justification that could make such a decision anything other than dangerous and "patent[ly] unreasonable."[102]

Similarly, the Park's monitoring schedule required monitoring at specified frequencies ranging from once every 30 minutes up to every 24 hours, depending on the variable to be recorded. For monitoring "Transport Winds" the monitoring plan specifically states "[d]o not violate for more than 3 hours or past 1500 hours." This

---

[101] *Id.* at 897.

[102] *Hajdusek*, 895 F.3d at 152–53. Notably, the Government fails to identify any Park Policy which conferred discretion on Salansky to seize all command roles throughout the Chimney Tops 2 fire.

48

type of scientific data recording does not confer any "economic" policy discretion; these are safety thresholds based upon established professional and fire science standards. The economic burdens of the schedule had already been weighed when it was adopted. And even if the Park's monitoring schedule conferred some limited discretion, under any reasonable interpretation of the discretion conferred, it would still be patently unreasonable to completely stop all monitoring of an active wildfire at night.  Tragically, in this case, smoke detectors were sounding and the public was calling 911 to alert local authorities to the fire's overnight advance into the City, rather than the Park Officials responsible for the Park's monitoring schedule.[103]

The Government's attempts to identify a policy-based justification for failing to utilize the WFDSS system must also fail as unreasonable and dangerous to public safety. No legitimate policy could even in theory support a decision to not utilize the WFDSS, which was designed to ensure basic safeguards are instituted for fire response plans. The Park Service had already policy-balanced these fire-fighting tools and decided to integrate the WFDSS comprehensively into every facet of the NPS' fire management policy as a bulwark against impromptu fire response plans. Like the mine inspectors in *Myers*, 17 F.3d at 898, NPS officials were not authorized to re-balance these policy concerns on a case-by-case basis.

---

[103] ABS Report, RE 32-10, PAGE ID# 3543-44.

49

**C.** **This Court Has Already Decided that Even If Section 3.3.2 and Table 13 Do Not Set Forth Mandatory Directives to Warn, the Government May Still Not Be Entitled to Immunity Under the Second Prong**

In *Abbott*, a panel of this Court decided that even if "neither Section 3.3.2 nor Table 13 sets forth mandatory directives, the government is not shielded from liability unless both prongs of the discretionary-function test are satisfied." *Abbott*, 78 F.4th at 903. Therefore, because the district court in *Abbott* had only addressed the first prong of the discretionary-function analysis but the Sixth Circuit decided that each section may have provided mandatory directives, on remand the district court should consider the second prong only if necessary. 78 F.4th at 903. The same course of action is appropriate here. *See Wallace*, 764 F.3d at 583; 6 Cir. R. 32.1(b).

Remand is particularly appropriate given that the Government's sole argument as to the second prong is that conduct deemed to be discretionary at the first prong "must be presumed" to be grounded in policy. And even if such a presumption did not exist, the Government contends that "it is obvious that decisions about when and how to warn the public of hazards are 'susceptible to policy analysis.'"[104] According to the Government, it is "obvious" that "[t]he purpose of a warning is to influence the behavior of the public and other government officials in

---

[104] Principal and Response Brief for United States of America, ECF 94, p. 56.

the face of a particular hazard."[105]

The only way in which the policy considerations the Government recites are "obvious[ly]" "susceptible to policy analysis," however, supports Plaintiffs' arguments, not the Government's. The *Abbott* court stated that the second prong requires the government to demonstrate that its "administrative decisions" were "grounded in social, economic, and political policy" to be shielded from liability. *Abbott*, 78 F.4th at 903. But the mandatory language of § 3.3.2 and Table 13 already reflect the Government's enumerated policy decisions by requiring the Park, at minimum, to conduct an "antecedent assessment" and issue a mandatory warning if conditions warrant it. *Abbott*, 78 F.4th at 901. None of the cases cited by the Government defeat this notion or the holding of *Abbott*, which determined that "deciding whether to warn of potential dangers"[106] is *not* discretionary under the first prong of the test in certain circumstances.

In any event, the *Abbott* court took no occasion to consider the Government's arguments concerning policy, and this Court should not (and need not) consider them either—these arguments beg a question that the *Abbott* court purposefully did not

---

[105] Principal and Response Brief for United States of America, ECF 94, p. 56.

[106] Principal and Response Brief for United States of America, ECF 94, p. 57 (quoting *A.O. Smith Corp.*, 774 F.3d at 369; *Sharp*, 401 F.3d at 445; *Rosebush*, 119 F.3d at 443).

answer. Rather, this Court should remand to the district court for it to determine whether an analysis of the second prong is necessary at all.

## CONCLUSION

Based upon the foregoing, the ruling of the District Court, which granted the Government's Motion to Dismiss as to Plaintiffs' "fire management claims" based on the discretionary function exception to the FTCA, must be reversed, and the ruling of the District Court which denied the Government's Motion to Dismiss as to Plaintiffs' "failure to warn" claims must be affirmed.

Respectfully submitted this 10th day of October 2023.

/s/ *Matthew Evans*

Mark S. Grotefeld
**GROTEFELD HOFFMANN LLP**
6034 West Courtyard Drive, Suite 200
Austin, Texas 78730
mgrotefeld@ghlaw-llp.com

Jonathan J. Tofilon
**GROTEFELD HOFFMANN LLP**
407 S. Third Street, Suite 200
Geneva, Illinois 60134
jtofilon@ghlaw-llp.com

/s/*Matthew Evans*
Matthew J. Evans
BPR #017973
Daniel C. Headrick
BPR #026362
**KAY GRIFFIN EVANS, PLLC**
900 S. Gay Street, Suite 1810
Knoxville, Tennessee 37902
Matthew.evans@kaygriffin.com
Dheadrick@kaygriffin.com

*Attorneys for Plaintiffs, State Farm Fire & Casualty Company, State Farm Indemnity Company, State Farm Guaranty Insurance Company, State Farm Mutual Automobile Insurance Company, Lexington Insurance Company, AIG Property Casualty Company, Safeco Insurance Company of America, Safeco Lloyds Insurance Company, Safeco National Insurance Company, First*

*National Insurance Company of America, General Insurance Company of America, Liberty Insurance Corporation, Liberty Mutual Fire Insurance Company, The Cincinnati Insurance Company, The Cincinnati Casualty Company, Cincinnati Indemnity Company, Country Mutual Insurance Company, Country Casualty Insurance Company, Philadelphia Indemnity Insurance Company, Granite State Insurance Company, Illinois National Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Encompass Indemnity Company, Encompass Insurance Company of America*

/s/Matthew Evans
Matthew J. Evans
BPR #017973
Michael A. Johnson
BPR #030210
**KAY GRIFFIN, PLLC**
900 S. Gay Street, Suite 802
Knoxville, Tennessee 37902
Matthew.evans@kaygriffin.com


*Attorneys for Plaintiffs American Reliable Insurance Company, United National Insurance Company, American Security Insurance Company, American Bankers Insurance Company of Florida, Standard Guaranty Insurance Company, Farmers Insurance Exchange, Fire Insurance Exchange, Foremost Insurance Company Grand Rapids, Michigan, Foremost Property and Casualty Insurance Company, Foremost Signature Insurance Company, Illinois Farmers Insurance Company, Mid-Century Insurance Company, Truck Insurance Exchange, and Nautilus Insurance Company, United Services Automobile Association, USAA Casualty Insurance Company, USAA General Indemnity Company, and Garrison Property and Casualty Insurance Company*

/s/Evan B. Stephenson
**EVAN B. STEPHENSON**
Colorado Bar No. 37138
**SPENCER FANE LLP**
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203

54

estephenson@spencerfane.com
(303) 839-3800; Fx: (303) 839-3838


***Attorneys for Plaintiffs Auto-Owners Insurance Company, Owners Insurance Company, Southern-Owners Insurance Company, and Property-Owners Insurance Company.***

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.   This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P.32(f):

☒This document contains 10,130 words, or

☐This brief uses a monospaced typeface and contains [state the number of] lines of text.

2.     This document complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type-style requirements of Fed.R.App.P.32(a)(6) because:

☒This document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 35 in 14pt. Times New Roman, or

☐This document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

*/s/Matthew Evans*
Kay Griffin Evans, PLLC
900 S. Gay Street, Suite 1810
Knoxville, TN 37902

Attorney for Plaintiffs-Appellants

56

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a copy of the foregoing was submitted electronically through the Court's Electronic Filing System ("ECF") on October 10, 2023. Notice of this filing will be sent by operation of the Court's ECF to all parties indicated on the electronic filing receipt.

*/s/Matthew Evans*
Kay Griffin Evans, PLLC
900 S. Gay Street, Suite 1810
Knoxville, TN 37902

Attorney for Plaintiffs-Appellants

## DESIGNATION OF RELEVANT DOCUMENTS

*Auto-Owners Insurance v. U.S., 3:19-cv-478*

| *Record Entry* | *Page ID#* | *Description* |
|---|---|---|
| 32 | 1926 | Amended Complaint for Damages Under the Federal Tort Claims Act |
| 32-4 | 2177 | National Park Service Director's Order 18 (DO-18) |
| 32-5 | 2188 | National Park Service Wildland Fire Management Reference Manual 18 (RM-18) |
| 32-6 | 2560 | Great Smoky Mountains National Park Fire Management Plan ("Park Plan") |
| 32-7 | 2647 | Interagency Standards for Fire and Fire Aviation Operations 2016 ("Redbook") |
| 32-8 | 3110 | National Park Service Fire Monitoring Handbook ("FMH") |
| 32-9 | 3396 | National Park Service Chimney Tops 2 Fire Review, Individual Fire Review Report ("NPS Report") |
| 32-10 | 3514 | After Action Review of the November 28, 2016 Firestorm ("ABS Report") |
| 36-1 | 3717 | Defendant United States of America's Memorandum in Support of Motion to Dismiss for Lack of Jurisdiction by |
| 39 | 3755 | Plaintiffs' Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction |
| 42 | 3867 | Reply to Response to Motion to Dismiss for Lack of Jurisdiction filed by United States of America |
| 51 | 3938 | Memorandum Opinion and Order granting in part and denying in part Motion to Dismiss for Lack  of Jurisdiction |
| 147 | 4890 | Plaintiffs' Amended Joint Notice of Appeal |

*State Farm Fire & Casualty Company v. U.S., 3:19-cv-470*

**(excluding documents in duplicate of those identified above**)

| *Record Entry* | *Page ID#* | *Description* |
|---|---|---|
| 1 | 1 | Complaint |
| 41-1 | 1459 | Defendant United States of America's Memorandum in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction |
| 45 | 1496 | Plaintiff's Response in Opposition to Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction |
| 46 | 1565 | Defendant United States of America's Reply in Support of Its Motion to Dismiss for Lack of Subject Matter Jurisdiction |
| 50 | 1598 | Plaintiffs' Supplemental Brief Re: Admissions Contained Within the NPS Report, In Opposition to Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction |
| 51 | 1613 | Defendant United States of America's Memorandum of Law Regarding the Chimney Tops 2 Fire Review Report |
| 52 | 1622 | Defendant United States of America's Response to Plaintiffs' Supplemental Briefs Regarding Chimney Tops 2 Fire Review Report |
| 53 | 1635 | Plaintiffs' Response Brief in Opposition to Defendant United States of America's Memorandum of Law Regarding the Chimney Tops 2 Fire Review Report |

*American Reliable Insurance v. U.S. 3-19-cv-469*
(***Duplicate filings only***)


*United Services Auto Ass'n v. U.S., 3:19-cv-472*
(***Duplicate filings only***)


*Allstate v. U.S., 3:19-cv-474*
(***Duplicate filings only***)